RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2003 FED App. 0259P (6th Cir.)
File Name: 03a0259p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SAGINAW BAY PIPELINE
COMPANY, CMS SAGINAW
BAY COMPANY, SAGINAW
BAY LATERAL COMPANY, and
CMS SAGINAW BAY LATERAL
COMPANY,
    *Plaintiffs-Appellants,*

    *v.*

UNITED STATES OF AMERICA,
    *Defendant-Appellee.*

No. 01-2599

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-70454—John Corbett O'Meara, District Judge.

Argued: May 7, 2003

Decided and Filed: July 30, 2003

Before: KRUPANSKY, SILER, and GILMAN, Circuit
Judges.

---

---

### COUNSEL

**ARGUED:** Todd R. Mendel, BARRIS, SOTT, DENN &
DRIKER, Detroit, Michigan, for Appellants. Teresa T.
Milton, UNITED STATES DEPARTMENT OF JUSTICE,
APPELLATE SECTION TAX DIVISION, Washington,
D.C., for Appellee. **ON BRIEF:** Todd R. Mendel, BARRIS,
SOTT, DENN & DRIKER, Detroit, Michigan, Thomas P.
Marinis, Jr., VINSON & ELKINS, Houston, Texas, for
Appellants. Teresa T. Milton, Richard Farber, UNITED
STATES DEPARTMENT OF JUSTICE, APPELLATE
SECTION TAX DIVISION, Washington, D.C., for Appellee.
Alan I. Horowitz, Tamara W. Ashford, MILLER &
CHEVALIER CHARTERED, Washington, D.C., for Amicus
Curiae.

---

### OPINION

---

KRUPANSKY, Circuit Judge. The plaintiffs-appellants,
Saginaw Bay Pipeline Company, CMS Saginaw Bay
Company, Saginaw Bay Lateral Company, and CMS Saginaw
Bay Lateral Company (collectively "the plaintiffs," "Saginaw
Bay," or "the pipeline companies"),[1] have contested the

---

[1] Plaintiffs Saginaw Bay Pipeline Company and CMS Saginaw Bay
Company formed a limited business partnership known as "Saginaw Bay
Area Limited Partnership." Plaintiffs Saginaw Bay Lateral Company and
CMS Saginaw Bay Lateral Company created a second limited partnership
called "Saginaw Bay Lateral Limited Partnership." Together, those two
limited partnerships developed and constructed, and at all times relevant
to the case *instanter* owned and operated, the Saginaw Bay natural gas
pipeline network at issue herein.

On review, the American Petroleum Institute ("API"), with leave of

district court's disallowance, following a bench trial, of their claim against the defendant-appellee United States of America through the Internal Revenue Service (hereinafter "the defendant," "the government," or "the I.R.S.") for reimbursement of $3,474,244.00 in income tax payments, deposited under protest, which the I.R.S. had assessed via tax deficiency notices for the five calendar years 1991 through 1995. *See Saginaw Bay Pipeline Co. v. United States*, No. 99-CV-70454, 2001 WL 1203283 (E.D. Mich. Aug. 23, 2001) (ordering final judgment for the defendant United States); *Saginaw Bay Pipeline Co. v. United States*, 124 F. Supp. 2d 465 (E.D. Mich. 2000) (denying, on cross-motions, summary judgment to all litigants). The sole issue in controversy was (and remains) whether, under prevailing law, the plaintiffs' underground natural gas pipelines should be depreciated over a seven-year period, as argued by the plaintiffs, or instead should be subject to fifteen-year depreciation, as asserted by the government and as resolved by the district court. The factual and legal epicenter of the dispute is whether or not the subject pipeline system is a "gathering" pipeline (as defined and developed herein) used in the gas production process even though the plaintiffs are not themselves producers of natural gas.

In the late 1980s, Shell Western Exploration and Production, Inc. ("SWEPI"), a division of Shell Oil Company ("Shell"), commenced negotiations with the Michigan Consolidated Gas Corporation ("MichCon") for MichCon's construction and operation of a steel pipeline system to transmit unprocessed natural gas (known in prevailing

the court, lodged an *amicus curiae* brief in support of the plaintiffs. API described itself as "a national trade association representing the entire petroleum industry, including companies engaged in exploration and production, transportation, refining, and marketing. With over 400 member companies and with petroleum councils in 27 state capitals representing members in 33 states, API is dedicated to protecting and advancing the interests of all parts of the oil and natural gas industry."

industry parlance as "raw" or "wet" natural gas) from SWEPI's gas wellheads in eighteen distinct production fields located in the Michigan East Central Basin to its natural gas processing plant situated in Kalkaska, Michigan ("the Kalkaska facility"). MichCon, through its subsidiary MCN Corporation, formed the plaintiff entities for that purpose. Between 1988 and 1990, the plaintiffs constructed, in accordance with SWEPI's specifications, a 126-mile subterranean steel pipeline network traversing six Michigan counties which linked SWEPI's East Central Basin gas fields to the Kalkaska facility.

That system consisted of a central line leading into the Kalkaska processing plant, which was fed by lateral adjoining pipes which linked specific wellheads to "field separators"[2] and ultimately to the main pipeline. The main pipeline had a daily maximum capacity of 135 million cubic feet of "wet" gas. At all times material to this litigation, although the plaintiffs owned and operated the pipeline system, the transient "raw" natural gas remained the property of its

---

[2] The plaintiffs' standard service contracts with gas producers required that the producers separate specified amounts of water, sand, and certain other materials from the natural gas at the wellhead via the use of "field separators," prior to the introduction of the extracted hydrocarbons into the Saginaw Bay pipeline system, in order to meet specifications engineered to reduce the risks of pipeline corrosion and obstruction. Accordingly, the Saginaw Bay system's lateral gathering lines did not connect *directly* to the field wellheads, and its lines transported *partially* purified "raw" natural gas. Nevertheless, the gas moved by the pipeline companies from the gas fields to the Kalkaska processing plant was *not* consumable "dry" methane gas. Rather, although that product contained contract-restricted quantities of certain natural pollutants, it nonetheless required substantial processing at the Kalkaska facility to complete its final conversion into "*dry* pipeline-quality" methane fuel suitable for sale to end users. See further discussion below.

producer throughout the transportation process.[3]    The producers compensated the plaintiffs for the use of the pipeline on a contractual "fee-for-service" basis.

Natural gas, in its "raw" form when extracted from the earth at the wellhead, is typically contaminated with numerous impurities, including, among other things, butane, ethane, pentane, propane, water, nitrogen, carbon dioxide, other inert gases, sulphur, sand, and drilling fluids.  All adulterants must be substantially removed at a purification site such as the Kalkaska facility, leaving only nearly-pure "dry" methane gas, prior its sale to residential or commercial consumers.    The cleansed, customer-ready "dry" petrochemical fuel is then exported from the purification plant to distributors or other customers via lines which, for purposes of this decision, shall be denominated "transmission" or "distribution" pipelines, which are pipelines designed and operated solely for the carriage of "dry" hydrocarbon gas, sometimes referred to in the fossil fuel business as "pipeline-quality gas."[4]  By contrast, because the Saginaw Bay pipeline was designed to, and was operated as,

---

[3]During the relevant period 1991-95, the Saginaw Bay pipeline network did not exclusively transport "wet" gas belonging to SWEPI. Rather, it also carried "raw" natural gas produced by, among others, Sun Oil, Marathon, Oryx, and Amoco.

[4]Although both "transmission" lines and "distribution" lines carry pure, "dry" natural gas for ultimate consumer use, the term "transmission line" evidently is most frequently used to describe an interstate pipeline which carries clean processed gas from a cleansing center to a distribution center, whereas the phrase "distribution line" apparently is most often employed to describe a pipeline which transfers "dry" gas from a local distribution center to specific business or residential customer addresses. *See, e.g., Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 691 (1954) (Clark, J., dissenting) ("The natural gas industry, like Ancient Gaul, is divided into three parts.  These parts are production and gathering, interstate transmission by pipeline, and distribution to consumers by local distribution companies.")

a conduit for "wet" natural gas, it constituted a species of natural gas transportation pipeline frequently described, within prevailing natural gas industry nomenclature, as a natural gas "gathering" pipeline.[5]

Because the respective functions of "gathering" pipelines, vis a vis "transmission" or "distribution" pipelines, as defined herein, are entirely distinct, the operating standards for the two systems are correspondingly dissimilar.  For example, whereas "transmission" or "distribution" pipeline systems are typically unable to safely accommodate any significant presence of solid or liquid contaminants, "gathering" pipelines including the Saginaw Bay system must be equipped to handle at least limited amounts of the non-gaseous components of "raw" natural gas.  Additionally, because "raw" natural gas ordinarily burns at a higher temperature than "dry" natural gas, "transmission" or "distribution" line service contracts generally provide for the transport of fossil fuel having a relatively low "heating value," usually *no more* than 950 British Thermal Units

---

[5]The record herein revealed that various terms of art frequently used in the natural gas trade have not always been used consistently, and may have different meanings when used in different contexts.  For example, main or trunk pipelines which adjoin lateral "gathering" lines running from field wellheads, which transmit the "raw" gas gathered from the lateral lines to a purification facility, have sometimes been called "transmission" pipelines.  Similarly, "wet" gas partially cleansed by field separators has occasionally been designated "pipeline-quality gas" in reference to its conformity to contract specifications for introduction into a "gathering" pipeline for carriage to a purification complex, as opposed to that term's more common usage in reference to "dry" gas which is suitable for transit via a "transmission" or "distribution" pipeline for ultimate delivery to a consumer.  However, as developed herein, the terminology used, whether by the pipeline's owner or anyone else, to describe or identify a particular pipeline, is not dispositive of its proper treatment under the federal income tax laws.  Rather, as evolved herein, the actual *functional use* to which a particular pipeline or pipe system is dedicated determines its asset classification for tax depreciation purposes.

("BTUs"); whereas "gathering" lines (including the Saginaw Bay system) transport "raw" gas with higher "energy values," typically ranging between 950 and 1400 BTUs. The Saginaw Bay service contracts specified that "the Gas shall have a total heating value per standard cubic foot of *not less* than 950 British thermal units." (Emphasis added).

Likewise, a "gathering" system must be constructed to function at relatively low pressures over comparatively short distances. The Saginaw Bay system could tolerate no more than 1440 pounds per square inch ("psi") of pressure, and covered only 126 miles. By contrast, a "transmission" or "distribution" line usually functions at comparatively higher pressures over longer distances, often totaling hundreds of miles.

Perhaps most significantly, "gathering" pipelines must be flushed out regularly – a process labeled "pigging" – to avert or delay excessive wear-and-tear pipeline corrosion and the accumulation of foreign obstructive materials, given the ubiquitous presence of contaminants dissolved within "wet" natural gas; whereas "transmission" or "distribution" lines conveying only clean "dry" gas never require that type of expensive and time-consuming routine maintenance. Record proof reflected that, during the interval pertinent to the instant action, at least some portions of the Saginaw Bay system required "pigging" twice or thrice daily.

Consequently, because the purposes and functions of "gathering" lines are commercially distinct from those of "transmission" or "distribution" lines, the coordinate economic costs and investment risks accompanying each are also diverse. The unique expenses and production delays affiliated with the regular "pigging" of "gathering" pipelines are obvious examples. The singular risks of serious damage to "gathering" lines by corrosion or obstruction, and the attendant initial need to construct a comparatively sturdy

"gathering" pipeline relative to a "transmission" or "distribution" line, constitute further examples.

Additionally, a functional "transmission" or "distribution" line will ordinarily retain a useful and profitable economic life for as long as gas dealers or consumers connected by that line to the processing plant continue to purchase heating gas; however, a "gathering" line more likely may become obsolete, redundant, or otherwise unprofitable *prior to* its natural "wear-and-tear" expiration, if, for example, the field wellheads it services become depleted or otherwise unproductive, or comparatively inexpensive alternate sources of "raw" natural gas accessible to the processing plant become competitively available. Accordingly, "gathering" lines are not only more costly and labor-intensive to construct, maintain, and operate, but also generally have a shorter operational life span than "transmission" or "distribution" lines.

Because both "transmission" or "distribution" natural gas pipes, and "gathering" natural gas lines, constitute property used in a trade or business, the owner of either type of pipeline is entitled to a "reasonable allowance" for annual depreciation of that asset against the owner's ordinary business income for a finite number of years. *See* 26 U.S.C. § 167(a)(1). The depreciation allowance for tangible property used in a trade or business should be ascertained by reference to three factors – namely the legally-prescribed (1) "depreciation method," (2) "recovery period," and (3) "convention" – for the business asset at issue. *See* 26 U.S.C. §§ 167(b), 168(a). The adversaries *sub judice* have agreed that the instant controversy involves only element two, the selection of the proper depreciation "recovery period" for the Saginaw Bay pipelines.

The plaintiffs, as taxpayers, must carry the burden of proving their entitlement to a claimed deduction which has been contested by the I.R.S. *Helvering v. Taylor*, 293 U.S.

507, 514 (1935). However, "if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer." *Hassett v. Welch*, 303 U.S. 303, 314 (1938).

The applicable depreciation "recovery period" is keyed to the "class life" of the subject property. 26 U.S.C. § 168(e)(1). An asset's "class life" is defined by referencing "the class life [category] prescribed by the Secretary which reasonably reflects the anticipated useful life of that class of property to the industry or other group." 26 U.S.C. § 167(m)(1) (repealed), *incorporated by reference into* § 168(i)(1).[6] The Treasury Regulations ("the Regulations") posit a "use-driven" *functional standard* for assigning asset classifications.[7] 26 C.F.R. § 1.167(a)-11(b)(4)(iii)(b).

However, the Treasury Secretary has promulgated *two* material, specific, functionally-defined natural gas industry asset life classifications which facially may encompass the Saginaw Bay pipeline complex -- to wit, Asset Class 13.2 (defined to include "gathering pipelines" and other property used in the production of natural gas), which has a listed "class life" of fourteen years and an associated General Depreciation System "recovery period" of seven years; and

---

[6] The parties herein have agreed that, although Congress removed § 167(m) from the tax code via a 1990 amendment, subsection 167(m)(1) has retained continuing vitality by its incorporation by reference into §168(i)(1), which remained a part of the code during the 1991-95 tax years material to the subject action. *Accord, Duke Energy Natural Gas Corp. v. Commissioner*, 172 F.3d 1255, 1257 (10th Cir. 1999).

[7] "For purposes of this section, property shall be included in the *asset guideline class for the activity in which the property is **primarily used***. See paragraph (e)(3)(iii) of this section for rule for leased property. Property shall be *classified according to primary use **even though the activity in which such property is primarily used is insubstantial in relation to all the taxpayer's activities***." 26 C.F.R. § 1.167(a)-11(b)(4)(iii)(b). (Emphases added).

Asset Class 46.0 (defined to include assets used in the carrying of gas by pipes), which triggers a listed "class life" of twenty-two years, and an accompanying General Depreciation System "recovery period" of fifteen years.[8] Rev. Proc. 87-56, 1987-2 C.B. 678, 684 (hereinafter "the Revenue Procedure").

The pipeline companies have maintained that the Saginaw Bay pipeline network fits into Asset Class 13.2, and hence they should be entitled to comparatively accelerated seven-year depreciation. By contrast, the I.R.S. argued, with success before the district court, that the plaintiffs' pipelines

---

[8] [Asset Class] 13.2: **Exploration for and Production of Petroleum and Natural Gas Deposits**:

Includes assets *used by* petroleum and *natural gas producers for* drilling of wells and *production of* petroleum and *natural gas, including gathering pipelines* and related storage facilities. . . .

. . . .

[Asset Class] 46.0: **Pipeline Transportation**:

Includes assets *used in the private, commercial, and contract carrying of* petroleum, *gas* and other products *by means of pipes* and conveyors. The trunk lines and related storage facilities of integrated petroleum and natural gas producers are included in this class. . . .

Rev. Proc. 87-56, 1987-2 C.B. 678, 684. (Boldface in original; italics added). "Trunk lines" are large-diameter, usually high-pressure mainlines which connect distant points; they generally include "transmission lines." However, large "gathering" main lines are sometimes also referred to as "trunk lines." Nevertheless, reading the two asset class descriptions together, it is evident that all functionally-defined "gathering pipelines" should be consigned to Asset Class 13.2, leaving all remaining natural gas transport lines (such as "transmission" and "distribution" lines, as well as non-gathering "trunk lines" owned by integrated producers of natural gas which are used to transmit "dry" natural gas to distributors or consumers) within Asset Class 46.0. See further development below.

belong in Asset Class 46.0, which authorizes fifteen-year depreciation.

To date, the only sister circuit to confront a similar contest has been the Tenth Circuit, which, on nearly identical facts,[9]

---

[9]The government has averred that a material fact distinguishes Duke Energy's pipeline systems from the Saginaw Bay pipelines, because the United States in *Duke Energy* did not dispute that Duke's pipeline networks were "gathering systems" for asset class attribution purposes (*see Duke Energy Natural Gas Corp. v. Commissioner*, 172 F.3d 1255, 1256-58 (10th Cir. 1999)); whereas in the case here in controversy the trial court agreed with the government's argument that the Saginaw Bay network was *not* a "gathering system." *See Saginaw Bay Pipeline Co. v. United States*, No. 99-CV-70454, 2001 WL 1203283, at *2-3 (E.D. Mich. Aug. 23, 2001) (finding, as a matter of both fact and law, that the Saginaw Bay pipeline was not a "gathering" pipeline because it did not directly connect to any field wellhead, and also because it was not substantially located on a natural gas producer's land from which natural gas was extracted). In support of its "disconnection" theory, the trial court adopted the reasoning of a non-controlling Fifth Circuit decision, *Hamman v. Southwestern Gas Pipeline, Inc.*, 721 F.2d 140, 142-43 (5th Cir. 1983), by which that court had construed federal natural gas pipeline *safety regulations* to require that "gathering" lines must attach directly to wellheads. The key regulation posited that a "'gathering line' means a pipeline that transports gas from a current production facility to a transmission line or main." 49 C.F.R. § 192.3. (A gas wellhead qualifies as a "current production facility"). The *Hamman* court's construction of that regulation to restrict the meaning of "gathering pipeline" solely to lateral "feeder" pipelines which connect directly to field wellheads, as opposed to pipelines which transport natural gas from field wellheads but do not physically join those wellheads, is facially open to question. At any rate, to the extent that *Hamman* might carry any persuasive weight in the Sixth Circuit, it would be restricted to construction of the laws governing natural gas *pipeline safety*, such as the federal rules controlling the depths at which certain types of gas pipelines must be buried. *See Hamman*, 721 F.2d at 142. No evident rationale supports the application of a safety regulation's judicially-refined definition of "gathering pipeline" to the income tax depreciation regulations, given the total dissimilarity of the purposes of the two sets of standards. *Id*. at 143 ("Keeping in mind that Congress meant the [Natural Gas Pipeline Safety] Act to minimize accidents caused by natural gas pipelines, we hold that a pipeline must be directly attached to a gas well in order to meet the

reversed the United States Tax Court's application of fifteen-year depreciation, in favor of the seven-year writeoff. *Duke Energy Natural Gas Corp. v. Commissioner*, 172 F.3d 1255

---

gathering line definition.").

Similarly, the district judge's invocation of *Public Service Commission of Kentucky v. Federal Energy Commission*, 610 F.2d 439, 444 (6th Cir. 1979) (ruling that exclusive federal regulatory jurisdiction under the Natural Gas Act encompassed natural gas from the moment that it entered the stream of interstate commerce by exiting the wellhead and entering a "gathering" pipeline, despite a statutory exemption permitting state regulatory jurisdiction over "production and gathering" activities, which the court construed to be limited to production activities undertaken by natural gas producers upon the real estate where the gas wellheads were located) was misconceived. The trial jurist erroneously intimated that *Public Service Commission* supported the conclusion that *only* gas production activities which occurred on the realty which produced the natural gas should be categorized as "gathering" activities, and therefore pipelines largely lying on property from which no gas was extracted should not be deemed "gathering" pipelines for any purposes including income tax asset classification. However, although the transported contents of "gathering pipelines" might be distinguishable from "gathering" activities which transpire on the producer's property or leasehold for federal regulatory jurisdictional purposes, that distinction is entirely immaterial to the federal income tax depreciation treatment of pipelines which transport "wet" as opposed to "dry" natural gas, irrespective of the label attributed to such pipelines.

Accordingly, the trial court erred, as both a matter of fact and law, by characterizing the Saginaw Bay pipelines as something other than a "gathering" system as defined for purposes of the instant litigation. *See Razavi v. Commissioner*, 74 F.3d 125, 127 (6th Cir. 1996) (explaining that a district court's findings of historical fact are examined for clear error, but its applications of law to the facts and its ultimate legal conclusions including resolutions of mixed questions of law and fact are scrutinized *de novo*). As illuminated herein, the undisputed *practical uses* to which the Saginaw Bay pipelines were put during the five tax years in controversy militated to characterize them as "gathering pipelines" for income tax purposes within the ambit of Asset Class 13.2 as a matter of law, irrespective of their lack of direct connections to field wellheads by reason of intervening "field separators," and regardless of the subject pipeline's situs on land from which natural gas was not extracted.

(10th Cir. 1999). That court ruled that, although Duke Energy was not itself a "producer" of natural gas, its "gathering" systems were primarily *used by* gas producers to transmit partially-cleansed-but-essentially-still-"wet" natural gas to purification plants. *Id*. at 1258. Moreover, after weighing factors such as the comparatively low operational pressures, generally confined geographical areas serviced, and relatively short potential economic life spans attributable to Duke's "gathering" pipe systems, the Tenth Circuit concluded that, as a functional issue, "[t]he net effect is that the economic character of Duke's gathering activities is more akin to production than pipeline operation."[10] *Id*. at 1258-59.

---

[10]The initial adjudicator in the case in controversy opined that "*Duke* was wrongly decided in its interpretation of the term 'used by' in the first sentence of Asset Class 13.2." *Saginaw Bay Pipeline Co. v. United States*, No. 99-CV-70454, 2001 WL 1203283, at *2 (E.D. Mich. Aug. 23, 2001). In reality, the district court had misconstrued the "used by" phraseology to mean "owned by" a natural gas producer. As persuasively explicated by the Tenth Circuit:

> We are not persuaded by the government's interpretation of the asset class descriptions. "Use" does not mean "own" in either the legal dictionary definition of the word use, *see Black's Law Dictionary* 1541 (6th ed. 1990) ("To make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of; to put into action or service, especially to attain an end."), nor in everyday parlance. . . .

> The Revenue Procedure before us creates and describes asset classes for the purpose of establishing depreciation schedules, and contains critical information affecting taxpayer decisions about capital investment. We cannot accept the government's attempt to interpolate the words "owned by" into the description of Asset Class 13.2. We instead interpret that description to include any gathering system, so long as it is used by a gas producer--whether under its own ownership or through contractual arrangements--in the exploration for and production of petroleum and natural gas.

Indeed, the United States' posture that the depreciation status of pipelines which in fact are used as "gathering" lines should depend not upon their function and the costs and risks associated with their operation, but instead upon the business identity of their owners, would, if adopted, lead to the absurd result that pipelines used for identical "gathering" purposes would be depreciated over seven years if owned by a producer of natural gas, but would instead be subject to fifteen-year depreciation if owned by a pipeline company engaged in the trade of transporting "wet" natural gas for hire. As compellingly expressed by the *Duke Energy* court:

> Furthermore, were we to read a distinction into the asset classes requiring taxpayers to place the gathering systems of nonproducers in Asset Class 46.0 and the gathering systems of producers in Asset Class 13.2, we would thereby create an inconsistent regime for the depreciation of assets. If placed in different classes, gathering systems used for the same purpose and serving identical wells would fall under different depreciation schedules depending upon the producer or nonproducer status of the asset's owner. Moreover, if a producer sells a gathering system to a nonproducer such as Duke, the system would shift from one asset class to another without any change in its function or characteristics, and the system's new owner would be forced to depreciate the asset over a far longer period. Absent an explicit

---

*Duke Energy Natural Gas Corp. v. Commissioner*, 172 F.3d 1255, 1259-60 (10th Cir. 1999). Alternatively, the *Duke Energy* court convincingly illustrated that, even if the Asset Class 13.2 description could be rationally construed to *expressly* list "gathering" lines which were owned by natural gas producers, the use of the word "includes," rather than "includes *only*" (see note 8 above), signals an intent of its drafter not to restrict the asset classification solely to the listed property, but instead also to embrace "precisely analogous assets used by non-producers to provide services directly to producers." *Id*. at 1260 (*citing, inter alia*, 26 U.S.C. § 7701(c)).

distinction based on ownership in the Revenue Procedure, we decline to create such an inconsistency.

*Id*. at 1261. (Notes omitted).

The government's retort was anchored in an elaborate historical construct which tediously traced the pedigree of business property depreciation federal tax laws since the inception of modern national income taxation in 1913 in a bid to illustrate that, over the years, the United States had oft-times commanded varying tax treatments of similar business assets used for similar purposes on the sole basis that the respective owners of those assets were engaged in different commerce. That effort was unavailing, because, since at least the early 1970s, the United States has explicitly renounced an "industry-based" approach to asset classification in favor of a "use-based" system. *See* 26 C.F.R. § 1.167(a)-11(b)(4)(iii)(b) (applicable to property placed in service after December 31, 1970), which posits, among other things, that "[p]roperty shall be *classified according to primary use even though the activity in which such property is primarily used is insubstantial in relation to all the taxpayer's activities.*" (Emphasis added). The *Duke Energy* court had correctly rejected the same argument by the I.R.S.:

> The government argues that in previous iterations of the asset classes in dispute, the IRS distinguished between assets owned by gas producers and those owned by non-producers. *See, e.g.*, Rev. Proc. 72-10, 1972-1 C.B. 721, 731 (superseding Rev. Proc. 71-25, 62-21); Rev. Proc. 71-25, 1971-2 C.B. 553, 556 (establishing Asset Class 13.2); Rev. Proc. 62-21, 1962-2 C.B. 418, 424 (establishing Guideline Class 17(b), which "[e]xclude[d] gathering pipelines and related storage facilities of pipeline companies"). *We first note that all of the relevant provisions of the earliest Revenue Procedures the government cites to support its interpretation of the current asset class descriptions have been explicitly superseded. See* Rev. Proc. 72-10, 1972-1 C.B. 721, 731 (superseding Rev. Proc. 71-25, 62-21); Rev. Proc. 71-25, 1971-2 C.B. 553, 566 (superseding Rev. Proc. 62-21).
>
> *More importantly, the language of the most recent--and relevant--of these prior iterations does not establish that gathering systems of nonproducers have been distinguished from those of producers for depreciation purposes since 1972.* See Rev. Proc. 77-10, 1977-1 C.B. 548, 548 (superseding Rev. Proc. 72-10, while noting that the change "was not intended to modify the composition of the existing classes of Rev. Proc. 72-10"). Rev. Proc. 72-10, 1972-1 C.B. 721, 723, which establishes the immediately prior (and still relevant) iteration of the applicable sentence of the description of Asset Class 13.2, states that the class "[i]ncludes assets used for drilling of wells and production of petroleum and natural gas, including gathering pipelines and related storage facilities, when these are related activities undertaken by petroleum and natural gas producers." This description relies upon essentially the same language as the current asset class in stating that *when gathering systems are "used for" the drilling and production processes of producers, they belong in Asset Class 13.2.* We are no more persuaded by the government's argument that the words "undertaken by"--which refer to "activities"--necessarily implies that the assets must be "owned by" producers than we are persuaded that the words "used by" necessarily require ownership. The relevant earlier asset class descriptions provide us with no clear mandate to distinguish between

gathering systems based upon ownership, and we therefore will not do so.[11]

*Id*. at 1260-61. (Emphases added).

This reviewing court has carefully considered the trial court's written opinions and final judgment, the briefs and all arguments of counsel, the material contained within the Joint Appendix, and the controlling legal authorities. It finds that the district court committed reversible legal and factual error by ruling that the Saginaw Bay pipelines at issue herein were not "gathering" pipelines subject to seven-year depreciation under the Revenue Procedure's Asset Class 13.2 definition. This court finds the Tenth Circuit's reasoning and conclusions articulated in *Duke Energy Natural Gas Corp. v. Commissioner*, 172 F.3d 1255 (10th Cir. 1999), to be logically persuasive and factually on point, and thus adopts its analysis and ruling. This court further concludes that the subsequent conflicting analysis and decision of the United States Tax Court in *Clajon Gas Co. v. Commissioner*, 119 T.C. 197, 2002 WL 31399696 (Oct. 25, 2002), was legally ill-formulated and unpersuasive.

In conclusion, this reviewing court rules that every natural gas carriage pipeline which functions as a "gathering" pipeline in the methane gas production process by transporting impure "raw" or "wet" natural gas from the field wellheads to a cleansing and processing facility qualifies as a "gathering pipeline" subject to seven-year General Depreciation System depreciation under the strictures of Asset Class 13.2 of Rev. Proc. 87-56, irrespective of the primary business of the owner of that pipeline, the other uses

---

[11] Accordingly, because Saginaw Bay's primary business is irrelevant to the depreciation classification of their pipelines used for natural gas "gathering" activities, the fact that the plaintiffs identified themselves on their tax returns as engaged in the trade of "natural gas transportation" (as opposed to production or "gathering") is immaterial.

of the land under which that pipeline runs, and/or whether that pipeline was connected by lateral "feeder" lines directly or indirectly to the field wellheads. Concordantly, all natural gas transportation pipelines used for any purpose other than the production-related "gathering" of "wet" gas, including dry-gas "transmission" and "distribution" pipelines as defined herein, should be depreciated over fifteen years under the General Depreciation System as Asset Class 46.0 property, even if they are owned or used by a producer of natural gas.

The judgment of the district court for the defendant is **reversed**, and the case is **remanded** for entry of judgment in favor of the plaintiffs and for such necessary further proceedings as are consistent with this disposition.