# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1922

_____

Clajon Gas Co., L.P.; Aquilla
Gas Pipeline Corporation;
Tax Matters Partner,

      Appellants,

    v.

Commissioner of Internal Revenue,

      Appellee,

_____

Gas Processors Association;
Western Gas Resources, Inc.;
American Petroleum Institute.

      Amici on Behalf
      of Appellant.

Appeal from the United States
Tax Court.

_____

Submitted:  September 8, 2003

Filed:  January 12, 2004

_____

Before SMITH, LAY, and MCMILLIAN, Circuit Judges.

_____

SMITH, Circuit Judge.

Clajon Gas Company ("Clajon")[1] appeals an adverse United States Tax Court[2] judgment requiring Clajon to depreciate the value of its natural gas pipeline system during certain audit years[3] using a fifteen-year, rather than a seven-year, depreciation schedule. For the reasons set forth herein, we reverse the Tax Court.

## I. *Background*

We begin our analysis of this taxpayer claim with a discussion about the relevant processes and facilities involved in the production of natural gas. Natural gas production is a multi-step process. These steps include extraction of the gas from the earth, processing to make it marketable, and transportation to storage. Natural gas emerges from the ground as a mixture of natural gas (methane), liquid condensate and, sometimes, oil. Gas typically flows from the well to a gathering system through "gathering pipelines," and the gathering system then aggregates the gas for delivery to a gas processing plant, transmission pipeline, or other central point. The gathering system may "dehydrate" the gas to remove water and "treat" the gas to remove corrosive substances. Without dehydration and treatment, natural gas is unusable. Gas that contains natural gas liquids ("NGLs")–such as ethane, propane, butane, and natural gasoline–is referred to as "wet gas." Wet gas must be processed at a gas processing plant to remove the NGLs before the gas can be transmitted to consumers. The resulting "residue gas" is delivered to a transmission line at the outlet of the

---

[1] Utilicorp United Incorporated is the parent corporation and agent for Clajon's tax matters partner, Aquila Gas Pipeline Corporation. Aquila is the successor to PSI Management, Incorporated, Clajon's tax matters partner for the earliest tax period at issue here. For ease of discussion, we collectively refer to these entities as "Clajon."

[2] We have jurisdiction to review decisions of the Tax Court pursuant to 26 U.S.C. § 7482(a)(1) and (b)(2) (2002).

[3] The Internal Revenue Service ("IRS" or "Commissioner") adjusted Clajon's partnership tax returns for the taxable years ending December 31, 1990, September 25, 1991, December 31, 1991, and June 30, 1992 ("the audit years").

processing plant. The company extracting the gas may own the gathering system, or it may be owned by an independent pipeline company that is not in the business of extracting gas from the earth.

The central issue in this case is whether Clajon's natural gas gathering pipeline systems[4] should be–for tax purposes–properly classified as production facilities or as transportation facilities. This issue, in large part, turns on the manner in which the pipelines are used in the collection and production of natural gas.[5]

Clajon owns and operates natural gas gathering pipeline systems. A "gathering-pipeline system" is a system of interconnected subterranean pipelines and related

---

[4] During the audit years, Clajon owned six natural gas gathering systems in Texas: Southeast Texas (SETPS), Mentone, Gomez, Maverick, Rhoda Walker, and Panola County. The SETPS, which comprised about 91% of the assets at issue, was constructed by Clayton Williams and his related companies, producers of natural gas, to gather gas that they produced at their own wells. The SETPS performed exactly the same functions before and after its sale by Clayton Williams to Clajon. Clajon also transported gas pursuant to a transportation agreement with the Lower Colorado River Authority ("LCRA"), which delivered treated gas to a residue line owned by Clajon and located downstream of Clajon's LaGrange processing plant. The residue line carried LCRA's gas to an interstate transmission pipeline for transport to consumers. A small fraction of Clajon's revenues, three percent in 1990 and five percent in 1991, consisted of revenues from such transportation of natural gas. The residue line used to transport the LCRA gas was not part of Clajon's SETPS gathering system located upstream of the LaGrange plant, and that residue line is not at issue in this proceeding.

[5] The SETPS included multiple compressor stations, dehydration units, and stations to handle fallout of liquid condensate. Gas from the SETPS was processed at one of Clajon's gas processing plants, which was connected to that system. Gas from Clajon's other systems was dry (contained little or no liquefiable hydrocarbons), thus making it unnecessary to process the gas in order to remove natural-gas liquids ("NGLs"). The Panola and Rhoda Walker systems provide compression and dehydration services. The Gomez and Mentone systems provide dehydration services.

compression facilities that collect the raw gas from wells and deliver it to a central point, such as a processing plant. Gathering lines may include thousands of miles of pipe that are typically located over a relatively small area. A gathering system's smaller diameter pipelines,[6] sometimes called feeder lines or lateral lines, connect individual wells or one or more central production facilities to larger diameter lines, or trunk lines, that deliver the gas to a gas processing plant or to a transmission line. Due to the short distances raw gas must travel in a gathering system, gathering lines typically are designed to function at relatively low pressure.

In contrast, a "transmission-pipeline system" carries residue gas from remote areas of production to local gas distribution systems for the end-use market. Typically, a transmission-pipeline company will not permit gas in its pipelines that does not meet its gas-contract specifications as to the content of NGLs, water, and other impurities. Transmission pipelines deliver this "pipeline quality" gas to gas distribution systems typically owned by local utilities that deliver it to industrial, commercial, and residential customers. Unlike gathering lines, transmission lines are not exposed to the same corrosive chemicals because those chemicals have been removed as part of the gathering and treatment processes. Transmission lines generally range from twenty to forty-two inches in diameter and may span hundreds or thousands of miles located over a large area. Consequently, transmission pipelines are designed to withstand the higher pressure required to move the gas greater distances.

Gathering pipelines typically have a shorter physical life–due to the corrosive effect of the impurities–than do transmission pipelines. The economic useful life of gathering pipelines is dependent on the productive life of a particular gas field or fields localized in one area–when all of the economically recoverable reserves in a field have been produced, the production activity in that field terminates, and the

---

[6] Clajon's pipelines ranged in size from two to twenty inches in diameter.

gathering system serving that field may cease to be useful. On the other hand, the economic useful life of a transmission line is not tied to the economic useful life of any one gas field, as transmission lines serve multiple fields spread over a much larger area.

Clajon, a company that does not itself produce natural gas, contracted with gas producers who paid Clajon for the use of its gathering pipelines.[7] The majority of these contracts called for the producer to be paid a percentage of the proceeds derived from the sale of the natural gas after processing. Under a gas transportation contract, Clajon charged its customers a fee to move gas through its systems.

## II. *Issue*

The issue facing us is straightforward: If Clajon's gathering systems are classified as production assets, they depreciate over a seven-year period. However, if the gathering systems are classified as transportation assets, they should depreciate over a fifteen-year period.

Our inquiry begins with an examination of the modified accelerated cost recovery system ("MACRS"),[8] the current system of depreciation rules. Under MACRS, the recovery period for a given asset is determined by the Asset Guideline Class to which the asset belongs under 26 U.S.C. § 167(m) of the Internal Revenue

---

[7] Under a wellhead purchase contract, Clajon purchased the gas at a meter on the producer's well site connected to Clajon's gathering system. The price was either fixed or calculated as a percentage of the proceeds Clajon received for its residue gas at the tailgate of the processing plant. Under a gas processing contract, Clajon and the producer shared revenues from Clajon's sale of both extracted NGLs and residue gas.

[8] MACRS is the result of Congress's 1986 revision of the "Accelerated Cost Recovery System." *See* Tax Reform Act of 1986, Pub. L. 99-514 (codified as amended in sections of 26 U.S.C.)

Code.[9] The asset classes are set out in Rev. Proc. 87-56, 1987-2 C.B. 674. *Saginaw Bay Pipeline Co., CMS v. United States*, 338 F.3d 600, 604 n. 6 (6th Cir. 2003); *Duke Energy Natural Gas Corp. v. Comm'r*, 172 F.3d 1255, 1257 (10th Cir. 1999).

Clajon contends that its gathering pipelines fall within Asset Class 13.2. This class "[i]ncludes assets used by petroleum and natural gas producers for drilling of wells and production of petroleum and natural gas, including gathering pipelines and related storage facilities." Rev. Proc. 87-56, 1987-2 C.B. 678. Natural gas production assets, including gathering pipelines under Asset Class 13.2, are depreciated over seven years. Rev. Proc. 87-56, 1987-2 C.B. 674. Natural gas processing plants are likewise depreciated over seven years under Asset Class 49.23.

The IRS contends that Clajon's pipelines fall within Asset Class 46.0. This class "[i]ncludes assets used in the private, commercial, and contract carrying of petroleum, gas and other products by means of pipes and conveyors. The trunk lines and related storage facilities of integrated petroleum and natural gas producers are included in this class." Rev. Proc. 87-56, 1987-2 C.B. 684. Transmission pipelines are depreciated over fifteen years under Asset Class 46.0. Rev. Proc. 87-56, 1987-2 C.B. at 684. Gas distribution assets also are depreciated over fifteen years under Asset Class 49.24. Rev. Proc. 87-56, 1987-2 C.B. at 686.

III. *Discussion*

We review tax court decisions as we do civil bench trials in district court. *Black Hills Corp. v. Comm'r of Internal Revenue*, 73 F.3d 799, 804 (8th Cir. 1996). We review de novo legal questions and mixed questions of law and fact; we review findings of fact under the clearly erroneous standard. *Id.* Clajon, as the plaintiff and

---

[9] Although Congress removed § 167(m) of the tax code in 1990, § 167(m)(1) remains vital by its incorporation by reference into 26 U.S.C. § 168(i)(l), which continued as part of the tax code for the audit years at issue.

taxpayer, must carry the burden of proving its entitlement to a claimed deduction that has been contested by the IRS. *Helvering v. Taylor*, 293 U.S. 507, 514 (1935). However, "if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer." *Saginaw*, 338 F.3d at 604 (quoting *Hassett v. Welch*, 303 U.S. 303, 314 (1938)).

## A. *Property Use*

The depreciation "recovery period" is dependent on the "class life," a term reflecting the "anticipated useful life of that class of property to the industry or other group." 26 U.S.C. § 167(m)(1) (repealed) *incorporated by reference into* § 168(i)(1). Asset classifications are based on a "use-driven" functional standard or, in other words, on how the asset is primarily used. 26 C.F.R. § 1.167(a)-11(b)(4)(iii)(b), Treas. Reg. Proper asset-class selection thus hinges on the primary use of the property. Treas. Reg. § 1.167(a)-11(b)(4)(iii)(b).We consider primary use for classification purposes "even though the activity in which [the] property is used is insubstantial in relation to all the taxpayer's activities." *Id.*

The government argues that the asset's primary use must be based on how the *taxpayer* uses the asset, not on how the asset itself is used. The government asserts that Treas. Reg. § 1.167(a)-11(b)(4)(iii)(b) makes plain that it is the taxpayer's–and not another's–primary use of the property that determines classification. The government bases its stance on the included sentence, "Property shall be classified according to primary use even though the activity in which such property is primarily used is insubstantial in relation to all the taxpayer's activities," and asserts that this reference to the taxpayer indicates that the "use" must be how the taxpayer uses the asset. *Id.*

Though this is the first time our circuit has faced this precise issue, other circuits have already addressed it. After careful consideration of the arguments, we, like our sister circuits in the *Saginaw Bay* and *Duke Energy* cases, conclude that

Clajon primarily used its gathering system assets in a manner that falls within the description of Asset Class 13.2: "assets used by petroleum and natural gas producers for . . . production of . . . natural gas, including gathering pipelines and related storage facilities."

As noted, there is a difference between "gathering pipelines" and "transmission pipelines." The *Saginaw Bay* and *Duke Energy* courts–faced with virtually identical facts– distinguished the two systems before determining that the pipelines in those cases were "gathering pipelines." We agree with their analysis and find that the pipelines at issue here are "used" to gather natural gas from the wellhead and deliver it to a gathering system and treatment plant. It just so happens that the owner of the pipelines–Clajon–is not the entity gathering the natural gas. Rather, Clajon is the pipeline owner that leases the space to producers. However, this difference in ownership status does not change how the pipelines are actually *used*.

B. *Ownership*

Revenue Procedure 87-56 describes the property included in Asset Class 13.2 as "assets used by petroleum and natural gas producers," including "gathering pipelines and related facilities." The government argues that gathering pipelines must be owned by a producer to qualify under Asset Class 13.2. Clajon, admittedly, is not a producer–as that term is defined in the industry–of natural gas.[10] Rather, Clajon owns the pipelines that, through various contracts, are leased to producers to transport natural gas from the well to production plants. However, the provision's plain language does not require that the producer must also be the owner of the gathering system assets.

_____

[10] A "producer" in the oil and gas industry is "an operator who owns wells that produce oil or gas." *Duke Energy Natural Gas Corp*., 172 F.3d at 1256 n. 2 (quoting Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 854 (9th ed. 1994)).

The IRS argues that because Clajon is not a "producer," Clajon's pipeline system merely "transports" natural gas rather than contributes to the "production" of natural gas. Therefore, asserts the IRS, the assets must fall within Asset Class 46.0. Again, however, the *Duke Energy* and *Saginaw Bay* courts discounted the IRS's reading of the provision, and we agree with their conclusion. The *Duke Energy* court noted that if these assets were divided into two groups based on the ownership of these types of pipelines–regardless of the fact that the pipelines were used for the same purpose–it would "create an inconsistent regime for the depreciation of assets." *Duke Energy*, 172 F.3d at 1261.

> If placed in different classes, gathering systems used for the same purpose and serving identical wells would fall under different depreciation schedules depending upon the producer or nonproducer status of the asset's owner. Moreover, if a producer sells a gathering system to a nonproducer such as Duke, the system would shift from one asset class to another without any change in its function or characteristics, and the system's new owner would be forced to depreciate the asset over a far longer period.

*Duke Energy*, 172 F.3d at 1261. The *Duke Energy* court refused to create this dichotomy absent an explicit distinction based on ownership in Rev. Proc. 87-56. *Id.*

In response, the government notes that previous versions of the relevant asset-class regulations distinguished gathering-system assets owned by gas producers and non-producers.[11] However, not only have these historical provisions been

---

[11] *See*, *e.g.*, Rev. Proc. 72-10, 1972-1 C.B. 721, 731 (superseding Rev. Proc. 71-25, 62-21); Rev. Proc. 71-25, 1971-2 C.B. 553, 556 (establishing Asset Class 13.2); Rev. Proc. 62-21, 1962-2 C.B. 418, 424 (establishing Guideline Class 17(b), which "[e]xclude[d] gathering pipelines and related storage facilities of pipeline companies").

superseded,[12] but the provision most recently superseded,[13] and the currently-applicable version of this provision,[14] do not distinguish between the gathering system assets of producers and non-producers for depreciation purposes. Nothing in Rev. Proc. 72-10, 1972-1 C.B. 721, 723[15] suggests that an ownership distinction should be made, nor does the "used for" language in Rev. Proc. 87-56, 1987-2 C.B. 674, 678, 684, suggest that "ownership" is a distinguishing factor when determining the appropriate asset class for depreciation purposes. Therefore, we, like the Sixth and Tenth Circuit Courts of Appeal, refuse to read such a distinction into the provision.

## IV. *Conclusion*

Both the plain language of the asset class descriptions and the primary use of Clajon's gathering systems in the process of producing natural gas leave us with the

---

[12] *See* Rev. Proc. 72-10, 1972-1 C.B. 721, 731 (superseding Rev. Proc. 71-25, 62-21); Rev. Proc. 71-25, 1971-2 C.B. 553, 566 (superseding Rev. Proc. 62-21).

[13] *See* Rev. Proc. 77-10, 1977-1 C.B. 548, (superseding Rev. Proc. 72-10, while noting that the change "was not intended to modify the composition of the existing classes of Rev. Proc. 72-10").

[14] *See* Rev. Proc. 87-56, 1987-2 C.B. 674.

[15] Rev. Proc. 72-10, 1972-1 C.B. 721 states that Asset Class 13.2 "[i]ncludes assets used for drilling of wells and production of petroleum and natural gas, including gathering pipelines and related storage facilities, when these are related activities undertaken by petroleum and natural gas producers."

firm conclusion that Clajon's gathering systems fall within Asset Class 13.2 rather than Asset Class 46.0. We, therefore, reverse the Tax Court's decision.[16]

———————————————————

[16] In its final footnote, the IRS contends that if we reverse the Tax Court, we must remand to allow the Tax Court to address whether any of Clajon's assets constitute "trunk lines" that fall into Asset Class 46.0. In essence, the IRS argues that because some of Clajon's gathering-system pipelines are sometimes referred to as "trunk lines" (due to their size or location in the gathering-system scheme), Asset Class 46.0 specifically includes them ("The trunk lines and related storage facilities of integrated petroleum and natural gas producers are included in this class . . . ."). Rev. Proc. 87-56, 1987-2 C.B. 678, 684.

We reject this contention. Within the natural gas and petroleum industry, the term "trunk line" can refer to the specific "transmission line" or to the more generalized "spine" or "main artery" within either a transmission or gathering system. *Saginaw Bay*, 338 F.3d at 605 n. 8. Our discussion herein clarifies that the true test for determining the proper Asset Class turns on the function and use of those pipelines–regardless of their names, sizes, or who owns them. As such, we conclude as a matter of law that all functionally-defined "gathering pipelines"–such as those in Clajon's gathering system–should be included in Asset Class 13.2, "leaving all remaining natural gas transport lines (such as "transmission" and "distribution" lines, as well as *non-gathering* "trunk lines" owned by integrated producers of natural gas which are used to transmit "dry" natural gas to distributors or consumers) within Asset Class 46.0." *Id*. (Emphasis added.)