**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 13 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DUKE ENERGY NATURAL GAS
CORPORATION,

      Petitioner - Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE,

      Respondent - Appellee,

---

GAS PROCESSORS ASSOCIATION
("GPA") AND WESTERN GAS
RESOURCES, INC. ("WGR"),

      Amici Curiae.

No. 98-9008

---

**Appeal from the United States Tax Court**
**(CIR No. 12720-96)**

---

David T. Harvin (Thomas P. Marinis, Jr., Sarah A. Duckers and Charles T. Fenn
with him on the briefs), Vinson & Elkins, L.L.P., Houston, Texas for Petitioner -
Appellant.

Teresa T. Milton, Tax Division, Department of Justice (Loretta C. Argrett,
Assistant Attorney General and Richard Farber, Tax Division, Department of
Justice with her on the brief), Washington, D.C., for Respondent - Appellee.

Richard B. Robinson, Lentz, Evans and King, P.C., Denver, Colorado, filed an
amici curiae brief for the Gas Processors Association ("GPA") and Western Gas
Resources, Inc. ("WGR").

Before **EBEL**, **McWILLIAMS** and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

Duke Energy Natural Gas Corporation ("Duke"), a Denver-based company, appeals an adverse Tax Court judgment requiring it to depreciate the value of its natural gas gathering systems over fifteen rather than seven years because those assets transport, rather than produce, gas. Exercising our jurisdiction to review the Tax Court's decision under 26 U.S.C. § 7482, we reverse and hold that gathering systems are assets used in the exploration for and production of petroleum and natural gas deposits for purposes of the Internal Revenue Code's Modified Accelerated Cost Recovery System ("MACRS").

**I**

Duke is the common parent of affiliated corporations that filed consolidated tax returns for the tax years at issue. Duke's wholly owned subsidiary, known during the time period at issue in this case as Associated Natural Gas, Inc., owns and operates several natural gas gathering systems and processing plants that service gas fields in Colorado, Louisiana, Texas, Alabama, Oklahoma, and

Kansas. The amount in dispute is $1,152,458, for the tax years ending September 30, 1991, and September 30, 1992.[1]

Natural gas emerges from wells as a mixture of gas, liquid condensate and, occasionally, oil. Unprocessed natural gas ("raw gas") is separated from this mixture when it passes through a separator near the well or at a central gathering point. After separation, the raw gas continues to contain entrained natural gas liquids ("NGLs"), water, and impurities that interfere with domestic or commercial use of the gas.

Gathering systems generally consist of interconnected subterranean natural gas pipelines and related compression facilities that collect the raw gas from wells and deliver it to a central point, such as a processing plant. The gas is transferred from the well owner's separator to gathering systems either where the gathering systems connect with the gas separation facilities, or at a common field point at which raw gas from multiple fields is gathered. Once gathered, the gas is treated in most instances by a processing plant, which produces both commercially marketable "pipeline quality" gas and separated NGLs, which can also be sold profitably. Duke's gathering systems deliver raw gas to either Duke's processing

---

[1]The government claims Duke owes $399,369 for the year ending September 1991 and $753,089 for the year ending September 1992.

plants, processing plants owned by unrelated third parties, or transmission pipelines without processing.

Generally, Duke gains title to the gas that flows through its gathering systems under three types of long-term contracts with gas producers.[2] The majority of these agreements are called "percentage of proceeds" contracts, under which the parties share revenues from the sale of gas and NGLs after they leave the processing plants. The second type is called a "keep whole" contract, that provides for redelivery of a thermally equivalent volume of residue gas to the producer. Under this kind of agreement, the producer receives that volume of residue gas, while Duke receives the proceeds from the NGLs that are separated in processing, and sometimes a processing fee. The third type is a "wellhead purchase" agreement, under which the producer receives a stated price for the gas delivered, and Duke sells both the dry gas and the NGLs. Additionally, Duke provides for producer use of its lines and pressure maintenance under "gathering fee" contracts.

Duke obtained its gathering systems both by developing its own and by acquiring existing systems from third parties, some of whom are gas producers.

---

[2]Within the oil and gas industry, a "producer" is "an operator who owns wells that produce oil or gas." Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms 854 (9th ed. 1994). Duke concedes that it is not a producer of gas as that term is used in the asset class descriptions of MACRS.

Those systems that Duke acquired continue to serve the same fields and to perform the same technical and physical functions as they did before Duke's acquisition.

## II

The issue before us is whether Duke's gathering system assets belong to a class of assets that must be depreciated over fifteen years, or to a class that can be depreciated over seven years.[3] MACRS, the current system of depreciation rules, is the result of Congress's 1986 revision of the Accelerated Cost Recovery System ("ACRS"), see Tax Reform Act of 1986, Pub. L. 99-514 (codified as amended in scattered sections of 26 U.S.C.), which Congress had originally established in the Economic Recovery Act of 1981, Pub. L. 97-34. See generally Simon v. Commissioner, 68 F.3d 41, 44-45 (2d Cir. 1995) (describing evolution of ACRS). Section 167(a) of the Internal Revenue Code allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) . . . of property used in [a] trade or business." Section 168 establishes the appropriate depreciation deduction—including the applicable depreciation method, recovery period, and convention—for tangible property. See I.R.C. § 167(b).

---

[3]The parties stipulate that Duke's processing plants are described in Asset Class 49.23 ("Natural Gas Production Plant"), and that these assets have a class life of fourteen years and can be depreciated over seven years.

An "applicable recovery period," for purposes of § 168(c), is based upon the "class life" of the property.  § 168(c), (e).  "Class life" means the class life that would have been applicable to the property as of January 1, 1986, under § 167(m).  See I.R.C. § 168(i)(1).  Section 167(m)(1), which has been repealed,[4] based "reasonable allowance" "on the class life prescribed by the Secretary which reasonably reflects the anticipated useful life of that class of property to the industry or other group."  The class lives of assets placed in service after 1986—including those at issue here—are set forth in Rev. Proc. 87-56, 1987-2 C.B. 674.

The asset classes that the parties identify as the likeliest candidates for Duke's gathering systems are the following:

[Asset Class] 13.2:  Exploration for and Production of Petroleum and Natural Gas Deposits:
Includes assets used by petroleum and natural gas producers for drilling of wells and production of petroleum and natural gas, including gathering pipelines and related storage facilities.  Also includes petroleum and natural gas offshore transportation facilities used by producers and others consisting of platforms . . ., compression or pumping equipment, and gathering and transmission lines to the first onshore transshipment facility.

[. . .]

---

[4]See Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11812(a)(1).

[Asset Class] 46.0: <u>Pipeline Transportation</u>:
Includes assets used in the private, commercial, and contract carrying of petroleum, gas and other products by means of pipes and conveyors. The trunk lines and related storage facilities of integrated petroleum and natural gas producers are included in this class.

Rev. Proc. 87-56, 1987-2 C.B. 678, 684.

Duke argues that Asset Class 13.2, with a class life of fifteen years and a depreciation recovery period of seven years, is the most appropriate for its gathering systems; the IRS, on the other hand, asserts that Asset Class 46.0, which has a class life of twenty-two years and a recovery period of fourteen years, is the class to which Duke's gathering systems belong. The Tax Court agreed with the IRS, finding that Duke's gathering systems "are primarily pipelines that are used by a nonproducer privately, commercially, and/or contractually to carry gas; they are not used by a producer to drill wells or produce gas." <u>Duke Energy Natural Gas Corp. v. Commissioner</u>, 109 T.C. 416, 420 (1997). Although Asset Class 13.2 includes "gathering pipelines and related storage facilities," the court found that such assets must be owned by—and not merely used for the benefit of—a producer in order to fall within that class. <u>Id.</u> at 420-21.[5]

_____

[5] We note, however, that a district court within this circuit, in a case that is currently on appeal, came to the opposite conclusion concerning the similar gathering systems of a different taxpayer. <u>See</u> <u>True v. United States</u>, No. 96-CV-1050-J, 1997 WL 836474, at *9 (D. Wyo. Nov. 3, 1997) (finding that the transportation function of gathering systems "cannot be fulfilled without providing a means for producers to get crude oil from the lease to the collecting point," and that therefore gathering systems should be treated as part of Class 13.2).

**III**

We review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." I.R.C. § 7482(a)(1). Because all of the facts presented to the Tax Court were stipulated, we review the purely legal question before us de novo. See Hawkins v. Commissioner, 86 F.3d 982, 986 (10th Cir. 1996); Anderson v. Commissioner, 62 F.3d 1266, 1270 (10th Cir. 1995).

**A**

We begin with an inquiry into the primary use of Duke's gathering lines within the natural gas industry. See Treas. Reg. §1.167(a)-11(b)(4)(iii)(*b*) ("Property shall be included in the asset guideline class for the activity in which the property is primarily used."). We consider primary use for classification purposes "even though the activity in which [the] property is used is insubstantial in relation to all the taxpayer's activities." Id. We conclude that the primary use of Duke's gathering system assets falls within the description of Asset Class 13.2: "assets used by petroleum and natural gas producers for . . . production of . . . natural gas, including gathering pipelines and related storage facilities."

Within the industry and in the functional and contractual relationship between producers and nonproducer gathering system owners, Duke's gathering systems are literally used by producers for gas production in a number of different

- 8 -

ways. First, gathering systems maintain the correct and necessary amount of system pressure without which gas could not flow from the well to the processing plant or transmission pipeline. Second, the transformation of raw gas into residue gas, which requires gas to be gathered and moved from wellhead to processing plant, is generally a necessary part of the production of natural gas as a marketable commodity. Finally, Duke and the producers with whom it contracts utilize complex agreements to share and/or transfer property rights at various points in the production and processing stages, such that the producers typically retain some interest in the gas as it is moving through the gathering system . As the parties agree, "producers would not be able to produce natural gas in the absence of an adequately designed gathering system." R. Doc. 23, at 14 (Stipulation of Facts, ¶ 45).

The gas industry's primary use of gathering systems contrasts with its use of transportation pipelines. Whereas gathering systems operate as low pressure systems that serve localized areas, transmission systems operate at high pressure and generally extend over long distances. Because they are more localized and serve far fewer fields than transmission systems, the economic lives of gathering systems are more closely tied to those of natural gas producers' wells than are transmission pipelines. Gathering lines on gathering systems have shorter physical life spans than transmission lines that transport processed gas.

Moreover, the complex contractual relationships between Duke and the producers whose gas it gathers create more interdependent relationships than those between transmission pipeline owners and gas producers, whose contracts during the period at issue were in the midst of a transition to an open-access, fee-for-transportation regime. The net effect is that the economic character of Duke's gathering activities is more akin to production than pipeline operation.

**B**

The plain language of Rev. Proc. 87-56 describes the property that can be included within Asset Class 13.2 as "assets used by petroleum and natural gas producers," including "gathering pipelines and related facilities." The literal terms of this description include any gathering system, so long as it is used by a gas producer. Furthermore, because the language of Asset Class 13.2 is inclusive—it "[i]ncludes assets used by petroleum and natural gas producers for drilling . . . and production"—we are persuaded that the plain language of Asset Class 13.2 leads most logically to a reading that includes Duke's gathering systems even though they are "used by" producers through contractual arrangements with Duke.

Whereas Asset Class 13.2 specifically includes "gathering pipelines and related facilities," Asset Class 46.0, which is named "Pipeline Transportation," refers in its description to "assets used in the private, commercial, and contract carrying of petroleum, gas and other products by means of pipes and conveyors."

Read together, the two asset classes distinguish between types of assets: "gathering pipelines" fall within Asset Class 13.2, and "trunk lines and related storage facilities" fall within Asset Class 46.0. Although gathering systems literally employ pipes, it is undisputed that trunk lines and gathering systems are mutually exclusive terms referring to different types of pipeline systems. Although gathering lines, like trunk lines, may in a broad sense "transport" or "carry" gas from one point to another within the literal terms of Asset Class 46.0, we cannot ignore their more specific inclusion as assets used in the exploration for and production of gas in Asset Class 13.2.

The government would have us read the words "used by" in Asset Class 13.2 to incorporate an ownership requirement, and therefore include only those gathering systems that are assets belonging to oil and natural gas producers. Because Duke is not a producer, the government argues, Duke's gathering systems merely transport gas through pipelines rather than operate as part of a larger endeavor to explore for and produce natural gas deposits. The assets, therefore, would fall within Asset Class 46.0 rather than 13.2, and would have to be depreciated over fifteen years.[6]

---

[6]The government's suggestion that asset classes should be applied categorically to industries rather than to particular assets, thus classifying Duke's assets under 46.0 on the basis of Duke's status as a non-producer, contradicts the "primary use" provision of Treas. Reg. 1.167(a)-11(b)(4)(iii)(*b*), as well as the government's own concession that Duke's processing plants fall within Asset Class 49.23, not 46.0.

We are not persuaded by the government's interpretation of the asset class descriptions. "Use" does not mean "own" in either the legal dictionary definition of the word use, see Black's Law Dictionary 1541 (6th ed. 1990) ("To make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of; to put into action or service, especially to attain an end."), nor in everyday parlance. Employing such an interpretation of the word "use" in this context would contradict the purpose of a Revenue Procedure, which is "published for the information and guidance" of taxpayers as well as the IRS. 26 C.F.R. § 601.601(d)(2)(i)(a); see also 26 C.F.R. § 601.601(d)(2)(i)(b) (describing the Revenue Procedure as "a statement of procedure that affects the rights or duties of taxpayers or other members of the public under the Code and related statutes or information that, although not necessarily affecting the rights and duties of the public, should be a matter of public knowledge").[7] As discussed

_____

[7] Although ordinarily the IRS is not bound by Revenue Procedures, Rev. Proc. 87-56 clearly meets the substantive and procedural requirements for it to have the "force and effect of law." Estate of Shapiro v. Commissioner, 111 F.3d 1010, 1017-18 (2d Cir. 1997) (describing test for whether the IRS is bound by a Revenue Procedure) (citing Ward v. Commissioner, 784 F.2d 1424, 1430-31 (9th Cir. 1986)). Because Rev. Proc. 87-56 is analogous to law in its force and effect, two well-established methods of interpreting revenue statutes are relevant: we look to the "ordinary, everyday senses" of the statute's words, see Crane v. Commissioner, 331 U.S. 1, 6 (1947); and "if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer," Hassett v. Welch, 303 U.S. 303, 314 (1938) (footnote omitted).

above, the assets at issue are clearly "used by" producers in the ordinary sense of those words.

The Revenue Procedure before us creates and describes asset classes for the purpose of establishing depreciation schedules, and contains critical information affecting taxpayer decisions about capital investment. We cannot accept the government's attempt to interpolate the words "owned by" into the description of Asset Class 13.2. We instead interpret that description to include any gathering system, so long as it is used by a gas producer—whether under its own ownership or through contractual arrangements—in the exploration for and production of petroleum and natural gas. Moreover, the word "includes" in Asset Class 13.2 suggests that even if the gathering systems at issue are not "used by" producers within the government's proposed construction of "use," the category nevertheless includes precisely analogous assets used by non-producers to provide services directly to producers. See I.R.C. § 7701(c) ("The terms 'includes' and 'including' when used in a definition contained in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined."); United States v. State Farm Fire & Casualty Co. (In re Joplin), 882 F.2d 1507, 1511 (10th Cir. 1989) (rejecting, under I.R.C. § 7701(c), an interpretation of the revenue laws that would substitute the term "limited to" for "including").

The government argues that in previous iterations of the asset classes in dispute, the IRS distinguished between assets owned by gas producers and those owned by non-producers. See, e.g., Rev. Proc. 72-10, 1972-1 C.B. 721, 731 (superseding Rev. Proc. 71-25, 62-21); Rev. Proc. 71-25, 1971-2 C.B. 553, 556 (establishing Asset Class 13.2); Rev. Proc. 62-21, 1962-2 C.B. 418, 424 (establishing Guideline Class 17(b), which "[e]xclude[d] gathering pipelines and related storage facilities of pipeline companies"). We first note that all of the relevant provisions of the earliest Revenue Procedures the government cites to support its interpretation of the current asset class descriptions have been explicitly superseded. See Rev. Proc. 72-10, 1972-1 C.B. 721, 731 (superseding Rev. Proc. 71-25, 62-21); Rev. Proc. 71-25, 1971-2 C.B. 553, 566 (superseding Rev. Proc. 62-21).

More importantly, the language of the most recent—and relevant—of these prior iterations does not establish that gathering systems of nonproducers have been distinguished from those of producers for depreciation purposes since 1972. See Rev. Proc. 77-10, 1977-1 C.B. 548, 548 (superseding Rev. Proc. 72-10, while noting that the change "was not intended to modify the composition of the existing classes of Rev. Proc. 72-10"). Rev. Proc. 72-10, 1972-1 C.B. 721, 723, which establishes the immediately prior (and still relevant) iteration of the applicable sentence of the description of Asset Class 13.2, states that the class "[i]ncludes

assets used for drilling of wells and production of petroleum and natural gas, including gathering pipelines and related storage facilities, when these are related activities undertaken by petroleum and natural gas producers." This description relies upon essentially the same language as the current asset class in stating that when gathering systems are "used for" the drilling and production processes of producers, they belong in Asset Class 13.2. We are no more persuaded by the government's argument that the words "undertaken by"—which refer to "activities"—necessarily implies that the assets must be "owned by" producers than we are persuaded that the words "used by" necessarily require ownership. The relevant earlier asset class descriptions provide us with no clear mandate to distinguish between gathering systems based upon ownership, and we therefore will not do so.

Furthermore, were we to read a distinction into the asset classes requiring taxpayers to place the gathering systems of nonproducers in Asset Class 46.0 and the gathering systems of producers in Asset Class 13.2, we would thereby create an inconsistent regime for the depreciation of assets. If placed in different classes, gathering systems used for the same purpose and serving identical wells would fall under different depreciation schedules depending upon the producer or nonproducer status of the asset's owner.[8] Moreover, if a producer sells a gathering

_____

[8]The government argues that some asset classes inconsistently treat the same asset
(continued...)

- 15 -

system to a nonproducer such as Duke, the system would shift from one asset class to another without any change in its function or characteristics, and the system's new owner would be forced to depreciate the asset over a far longer period.[9] Absent an explicit distinction based on ownership in the Revenue Procedure, we decline to create such an inconsistency.

## C

Finally, we note that the primary regulatory body for the oil and gas industry, the Federal Energy Regulatory Commission ("FERC"), treats gathering systems as "production-related" assets rather than as transmission facilities.

---

[8](...continued)
based solely on its ownership rather than its use. See, e.g., Rev. Proc. 87-56, 1987-2 C.B. 674 (distinguishing between assets used in the drilling of onshore gas wells by petroleum and natural gas producers, which fall under Asset Class 13.2 and are allowed a depreciation schedule of seven years, and the same assets used by nonproducers, which fall under Asset Class 13.1 and are allowed a depreciation schedule of five years); id. at 681-82 (excluding from Asset Class 37.11, "Manufacture of Motor Vehicles," those assets used in the manufacture of component parts of motor vehicles when they are used by anyone other than car manufacturers). These use-based distinctions, however, fail to persuade us that they represent an ownership-based deviation from the "primary use" rule. See id. at 678 (stating that Asset Class 13.1 "[d]oes not include assets used in the [drilling of oil and gas wells] by integrated petroleum and natural gas producers for their own account"); id. at 682 (stating that Asset Class 37.11 "[d]o[es] not include assets used in the manufacture of component parts if these assets are used by taxpayers not engaged in the assembly of finished motor vehicles").

[9]In a memorandum decision, the Tax Court has itself noted the absurdity of a similar interpretation of analogous language. See Illinois Cereal Mills, Inc. v. Commissioner, 46 T.C.M. (CCH) 1001, 1030 (refusing to find that an ownership change resulted in a change of "use" for purposes of determining the asset class of grain storage tanks), aff'd, 789 F.2d 1234 (7th Cir. 1986).

- 16 -

Although FERC has jurisdiction over the interstate transportation of natural gas, see 15 U.S.C. § 717(b), it does not have jurisdiction over "the production or gathering of natural gas." Id. Under FERC's multi-factor analysis of whether a particular asset's primary function is transportation or gathering and would therefore not be under FERC's jurisdiction, Duke's assets would most likely constitute assets used for gathering because of the diameter of the lines, their spider web configuration, and the operating pressure of the line. See EP Operating Co. v. FERC, 876 F.2d 46, 48 (5th Cir. 1989) (quoting Farmland Industries, Inc., 23 FERC ¶ 61,063, 61,143 (1983)) (describing FERC's primary function test); see also Associated Natural Gas, Inc., 71 FERC ¶ 61,048 (1995) (declaratory order stating that one of Duke's gathering systems in this case is not subject to FERC jurisdiction). Moreover, FERC's own Uniform System of Accounts, see 18 C.F.R. pt. 201, recognizes the function of gathering systems as a step between and related to production and processing.

The Tax Court summarily dismissed the distinction that FERC makes between gathering and transmission lines because FERC's practices have not been adopted by Congress or the Commissioner. See Duke Energy, 109 T.C. at 421. Nevertheless, we find the distinction FERC makes to be persuasive that the gas industry and the regulatory body overseeing it consider gathering systems to be used for the activity of production, rather than transportation.

## IV

Because of the primary use of gathering systems in the process of producing natural gas, as well as the plain language of the asset class descriptions, Duke's gathering systems fit more logically within Asset Class 13.2 than Asset Class 46.0.[10]

We therefore **REVERSE** the Tax Court's decision.

---

[10]Because of this conclusion, we need not address the parties' alternative arguments that Duke's gathering systems belong in either Asset Classes 49.23 ("Natural Gas Production Plant") or 00.3 ("Land Improvements").