# Supreme Court of Texas

No. 20-0639

Nettye Engler Energy, LP,

*Petitioner*,

v.

BlueStone Natural Resources II, LLC,

*Respondent*

On Petition for Review from the
Court of Appeals for the Second District of Texas

**Argued October 28, 2021**

JUSTICE DEVINE delivered the opinion of the Court.

Justice Young did not participate in the decision.

This mineral dispute involves a frequently litigated issue: whether and to what extent a royalty interest bears a proportionate share of postproduction costs. Here, the deed conveying the mineral estate reserved a nonparticipating royalty interest "in kind," which means that, unlike a monetary royalty, the grantor retained ownership of a fractional share of all minerals in place. The deed required delivery of the grantor's fractional share "free of cost in the pipe line, if any,

otherwise free of cost at the mouth of the well or mine[.]" The parties agree that a gas pipeline exists and that the royalty is free of production costs and postproduction costs incurred before delivery into that pipeline, but they disagree about its location under the deed's terms.

The grantee's successor maintains that delivery occurs in the gathering pipelines comprising the gas gathering system on the wellsite premises, which burdens the royalty interest with all postproduction costs from that point until the gas is sold to the ultimate purchaser. The grantor's successor contends that delivery is downstream of the wellsite at the transportation pipeline, if not farther, because (1) a gas gathering pipeline is not a pipeline as that term is used in the deed and (2) use of the term "otherwise" to introduce the alternative delivery point "at the mouth of the well or mine" essentially negates a construction of "the pipe line, if any" as including any pipeline at or near the wellhead. If the deed requires delivery in the transportation pipeline, the mineral interest is free of some but not all postproduction costs. The trial court granted summary judgment that delivery occurs in the transportation pipeline, but the court of appeals reversed and rendered judgment that delivery occurs in the gathering pipeline.

We affirm the court of appeals' judgment. A gas gathering pipeline is a "pipeline" in common, industry, and regulatory parlance, and the deed does not limit the delivery location to any specific pipeline nor prohibit delivery to a pipeline at or near the well, if any. The court of appeals reached the correct result but misconstrued our opinion in *Burlington Resources Oil & Gas Co. v. Texas Crude Energy, LLC*[1] as

_____

[1] 573 S.W.3d 198 (Tex. 2019).

establishing a rule that delivery "into the pipeline," or similar phrasing, is always equivalent to an "at the well" delivery or valuation point. Rather, the opinion merely emphasized that all contracts, including mineral conveyances, are construed as a whole to ascertain the parties' intent from the language they used to express their agreement.

## I. Background

In 1986, the predecessors of Nettye Engler Energy, LP (Engler) conveyed a 646-acre tract of land by a special warranty deed that reserved "an undivided one-eighth (1/8th) nonparticipating . . . royalty interest in and to all of the oil, gas and other minerals on, in and under the Subject Property." A nonparticipating royalty is "an interest in the gross production of oil, gas, and other minerals carved out of the mineral fee estate as a free royalty, which does not carry with it the right to participate in the execution of, the [b]onus payable for, or the delay rentals to accrue under oil, gas, and mineral leases executed by the owner of the mineral fee estate."[2] Such an interest is free of the costs of production,[3] and when delivered in kind as the deed requires here,[4] bears its proportional share of postproduction costs from the point of

---

[2] *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 75 (Tex. 2015) (citing Lee Jones, Jr., *Non-Participating Royalty*, 26 TEX. L. REV. 569, 569 (1948) (footnote omitted)).

[3] *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121-22 (Tex. 1996).

[4] *Chesapeake Expl., LLC v. Hyder*, 483 S.W.3d 870, 874 (Tex. 2016) (observing that "gross production" refers to the total volume of minerals extracted from the ground).

delivery to the royalty-interest holder unless the conveyance specifies otherwise.[5] The 1986 deed describes the royalty as

> a free one-eighth (1/8) of gross production of any such oil, gas or other mineral said amount to be delivered to Grantor's credit, free of cost in the pipe line, if any, otherwise free of cost at the mouth of the well or mine . . . .

In 2004, the grantees leased the tract's minerals, and the lessee subsequently drilled thirty-four producing wells. When gas is produced at the wellhead, it is collected in an onsite gathering system for compression, processing, and delivery to third-party transportation pipelines off the leased premises. From there, all the gas is sold to third parties at various downstream market locations. Both the gathering system and transportation pipelines are owned by third parties who charge the operator for these services.

For several years, Quicksilver Resources, Inc. served as the wellsite operator. Quicksilver sold Engler's share of production along with the producer's share and valued it for royalty purposes at the point of sale to the gas purchaser's pipeline. This valuation rendered Engler's in-kind royalty not only unburdened by production costs but also free of

---

[5] *Heritage Res.*, 939 S.W.2d at 121-22 (providing the general rule that royalties are subject to postproduction costs unless the contracting parties agree otherwise); Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What is the "Product"?*, 37 ST. MARY'S L.J. 1, 2-3, 13-20 (2005) (describing how, under an in-kind royalty agreement, a lessor is entitled to receive delivery of a proportional share of the lessee's production of oil or gas); Byron C. Keeling, *In the New Era of Oil and Gas Royalty Accounting: Drafting a Royalty Clause that Actually Says What the Parties Intend It to Mean*, 69 BAYLOR L. REV. 516, 520 n.17 (2017) (explaining that, subject to a royalty's terms, a lessee may market a lessor's share of production and pay the lessee the amount received for that share net of postproduction costs).

all postproduction costs. That is, Engler was paid a proportional share of the gross proceeds from downstream sales of processed gas to third-party purchasers.

In 2016, BlueStone Natural Resources II, LLC, assumed operations and began deducting postproduction costs in accounting to Engler for its proportional share of production. Under BlueStone's valuation, delivery of Engler's fractional share occurs at the point where unprocessed gas enters the gathering pipeline in the onsite gathering system. As a result, Engler's ownership interest bears a proportional share of postproduction costs from that point forward, including gathering, compression, and processing costs; transportation and delivery costs; and severance taxes. Unlike Quicksilver, which compensated Engler for its share of production based on its value at the end of the line, BlueStone values it at the beginning.

Engler's royalty payments dropped precipitously due to the deduction of postproduction costs from sales proceeds, prompting Engler to sue BlueStone for common-law conversion and money had and received. The central dispute concerned the proper construction of the 1986 deed's language. The parties generally agreed that (1) BlueStone must compensate Engler for its proportional share of sales proceeds net of expenses incurred after production is delivered to Engler's credit; and (2) BlueStone delivers Engler's share "in the pipe line," because one exists, rather than "at the mouth of the well." The point of dissension concerned the exact location where delivery occurs, with Engler taking the position that "in the pipe line" refers either to the distribution pipeline at the point of sale or to the offsite transportation pipelines, while BlueStone argued that the delivery obligation under the deed is

5

satisfied by delivery in the gathering pipelines comprising the onsite gathering system.

On cross-motions for summary judgment, Engler argued that because the 1986 deed provides for a "free one-eighth of gross production" to be delivered "free of cost," the royalty is free of all postproduction costs from the wellhead to the point of sale. Engler cited our opinion in *Chesapeake Exploration, L.L.C. v. Hyder*[6] as supporting the proposition that such language conclusively renders a royalty interest free of any and all postproduction costs. Alternatively, Engler claimed that a gathering system is not a pipeline or at least was not understood to be a pipeline when the deed was executed. For that reason, Engler argued that offsite transportation pipelines are the closest delivery point that would be consistent with the deed's language and, at a minimum, the royalty is free of gathering, compression, and processing costs incurred before that point. Engler urged that the deed's "in the pipe line" language necessarily refers to an offsite delivery point because the deed prioritizes delivery "in the pipe line, if any" over delivery "at the mouth of the well or mine" by using the word "otherwise" to introduce the latter as a default option when no pipeline exists.

BlueStone challenged Engler's proffered deed construction on the basis that (1) Engler misconstrued *Hyder*, which clearly holds that words like "free and clear" of all "costs and expenses" do not in and of themselves, or even necessarily, render a royalty free of all or any postproduction costs and (2) gathering pipelines are pipelines in both ordinary and trade meaning. That being so, BlueStone insisted that it

---

[6] 483 S.W.3d 870, 872-73 (Tex. 2016).

properly calculated Engler's royalty interest based on sales proceeds net of expenses incurred beyond the point Engler's share of production entered the onsite gathering system.

As summary-judgment evidence, Engler provided affidavit and deposition testimony from an oil-and-gas attorney to the effect that (1) the 1986 deed's reference to "pipe line, if any" refers to the main transportation pipelines and (2) based on the deed's "free one-eighth (1/8) of gross production" and "free of cost in the pipe line" language, Engler's royalty is free from all postproduction costs so long as the gas is in the transportation pipeline, meaning it is valued at the point of sale rather than at any other upstream point. The gist of the expert's testimony is that "pipe line" refers to the place where title passes from the operator/producer to the gas purchaser, and back in 1986, it was not uncommon for gas gathering systems to be owned by the operator/producer and for gas to be purchased by the transporter. Although Engler's expert did not testify that any such arrangements were in existence at the time the 1986 deed was executed—nor does the record include such evidence—he concluded that delivery "in the pipe line" refers not only to the transportation pipelines but also makes the royalty free of cost until title transfers to a third-party purchaser.

BlueStone objected to the expert's testimony on the basis that it was conclusory and opined on pure questions of law, which is not a proper use of expert testimony. BlueStone further observed that Engler's expert could not identify a fact that was in dispute in the case, and although he testified that the 1986 deed was unambiguous, he nonetheless opined on the deed's interpretation.

7

In addition to objecting to the admissibility of expert testimony with regard to the deed's interpretation, BlueStone conditionally offered a counter-affidavit from its own expert to refute Engler's expert's conclusions. BlueStone's expert testified that (1) the royalty reserved by Engler's predecessor clearly bears postproduction costs; (2) "free of cost" can mean free of production costs, so inclusion of the word "free" in a deed is not, by itself, enough to free an interest of postproduction costs; and (3) the phrase "mouth of the well" defines where the pipeline is located, which provides the valuation point for the royalty before postproduction costs have been incurred.

The trial court overruled BlueStone's objections and granted Engler's motion for summary judgment. The court held that Engler's royalty interest is "not subject to post-production costs" but, at the same time, deferred consideration of "the issue of the calculation of proper post-production costs [until] a subsequent proceeding." A few days later, we issued our opinion in *Burlington Resources*, in which we held that deed language requiring delivery "into the pipeline, tank or other receptacle to which any well or wells on such lands may be connected" was analogous to an "at the wellhead" valuation point.[7] When delivered at the well, a royalty interest is generally free of production costs but

---

[7] 573 S.W.3d 198, 211 (Tex. 2019) (construing an assignment providing that "[t]he overriding royalty interest share of production shall be delivered to ASSIGNEE or to its credit into the pipeline, tank or other receptacle to which any well or wells on such lands may be connected, free and clear of all royalties and all other burdens and all costs and expenses except the taxes").

not postproduction costs that enhance the downstream value of the product.[8]

BlueStone filed a motion for reconsideration in light of *Burlington Resources*, arguing it is directly on point and dispositive in equating an "into the pipeline" royalty provision with an "at the well" delivery point such that royalty payments based on proceeds of downstream sales are net of all downstream postproduction costs. The trial court denied BlueStone's motion but altered its prior ruling, ostensibly determining that Engler's royalty interest is free of cost in the transportation pipeline, not the gathering or distributing pipelines, and thus free of some but not all postproduction costs. With the deed so construed, the court rendered judgment that Engler's royalty is unburdened by all postproduction costs other than transportation costs, severance taxes, and regulatory fees. The court awarded Engler $88,849.33 in actual damages for the period of April 1, 2016, to March 31, 2019, and then severed that portion of the suit from Engler's claims for monetary damages for ongoing and future deductions. Though neither party scored a total victory, only BlueStone appealed the trial court's judgment.

The court of appeals reversed and rendered judgment for BlueStone.[9] First, the court viewed *Burlington Resources* as establishing a rule that the language "into the pipeline" is equivalent to

---

[8] *Id.* at 203.

[9] ___ S.W.3d ___, 2020 WL 3865269, at *4 (Tex. App.—Fort Worth July 9, 2020).

9

and creates a valuation or delivery point "at the wellhead or nearby."[10] Based on this understanding of our opinion, the court concluded that the 1986 deed's language—"free of cost in the pipe line, if any, otherwise free of cost at the mouth of the well or mine"—creates a delivery point equivalent to delivery at the well.[11] Second, the court rejected Engler's argument that a gathering system is not a pipeline, stating it is recognized and regulated as such under Texas law.[12] For these reasons, the court concluded that "the 1986 Deed's use of the phrase 'in the pipe line' effectively sets the valuation point at the wellhead."[13] The court therefore rendered judgment that Engler's royalty is subject to all postproduction costs after delivery in the gathering pipeline, including gathering, compression, and transportation costs, as well as severance taxes and regulatory fees.[14]

On petition for review to this Court, Engler assails the court of appeals' construction of *Burlington Resources* as adopting a rule divorced from contractual context. Engler contends that the 1986 deed, properly construed, sets the delivery point at the transportation pipelines. Engler also contends that the court of appeals erred in not considering the testimony of its expert. According to Engler, this testimony conclusively establishes that "the term 'pipe line' refers to the transporting pipeline company that purchases the gas that has been

---

[10] *Id.*

[11] *Id.*

[12] *Id.* at *5.

[13] *Id.*

[14] *Id.* at *2-3, 7.

10

gathered and delivered from the well to the interconnection point with the transporter," meaning that a mid-stream gas gathering system would not be considered a "pipeline" for purposes of delivery by those in the oil-and-gas industry, at least at the time the deed was executed.

In response, BlueStone defends the court of appeals' construction of *Burlington Resources* and the 1986 deed, advancing the same arguments asserted in the proceedings below. BlueStone also argues that the testimony of Engler's expert is no evidence of anything, let alone conclusive evidence of the deed's meaning, because it is conclusory, opines on questions of law, assumes facts contrary to those in the record, and is insufficient as a matter of law to create a fact question about the royalty clause's meaning.[15]

We hold that BlueStone discharged its royalty obligation by delivering Engler's fractional share of production in the gathering pipelines on the premises and, therefore, BlueStone properly deducted postproduction costs between that point and the point of sale in valuing Engler's royalty interest. While the court of appeals construed *Burlington Resources* more narrowly than the opinion's language contemplates, it reached the correct result under the 1986 deed's plain language.

---

[15] The Texas Land and Mineral Owners Association submitted an amicus brief supporting Engler's petition, and the Texas Oil and Gas Association submitted an amicus brief supporting BlueStone's argument. Byron C. Keeling submitted an amicus brief clarifying, as a legal and conceptual matter, the distinction between an in-kind royalty and a monetary royalty without opining on the merits of the case before the Court.

## II. Discussion

## A. Standards of Review

Deeds are interpreted and construed as contracts.[16] Summary judgment and contract-construction disputes present questions of law we review de novo.[17] Summary judgment is appropriate only when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.[18] When both parties move for summary judgment and the trial court denies one motion but grants the other, we review both, determine all questions presented, and render the judgment the trial court should have rendered.[19]

When construing an oil-and-gas deed, standard rules of contract construction apply.[20] Our objective is to "ascertain the true intentions of the parties as expressed in the writing itself," beginning with the instrument's express language.[21] In doing so, we consider the entire writing and attempt to harmonize the provisions so all are given effect and none are rendered meaningless.[22] We do this because we presume

---

[16] *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005).

[17] *Id.*; *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018).

[18] TEX. R. CIV. P. 166a(c).

[19] *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

[20] *Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019).

[21] *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).

[22] *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006).

the parties intended every clause to have some effect.[23] We afford contract language its plain, grammatical, and ordinary meaning unless doing so "would clearly defeat the parties' intentions" or the instrument shows the parties used the terms in a different or technical sense.[24]

Whether a contract is ambiguous or not is a question of law.[25] If a contract has a certain and definite meaning, the contract is unambiguous, and we will construe it as a matter of law[26] and enforce it as written.[27] A contract subject to more than one reasonable interpretation is ambiguous, giving rise to a fact issue regarding the parties' intent.[28] A contract may be ambiguous even if the parties agree it is not.[29] Here, although the parties advance different constructions and Engler relies, in part, on expert testimony to support its preferred construction, we conclude that the 1986 deed is not ambiguous.

When construing an unambiguous instrument, we may consult facts and circumstances surrounding its execution to aid our interpretation.[30] But there are limits. We cannot employ surrounding facts and circumstances to make contract language say something it

---

[23] *Heritage Res. Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).

[24] *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019); *Heritage Res.*, 939 S.W.2d at 121.

[25] *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018).

[26] *Barrow-Shaver*, 590 S.W.3d at 479.

[27] *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021); *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 728 (Tex. 1981).

[28] *Barrow-Shaver*, 590 S.W.3d at 479.

[29] *URI*, 543 S.W.3d at 763.

[30] *Id.* at 757.

13

unambiguously does not or to determine "that the parties probably meant, or could have meant, something other than what their agreement stated."[31] Rather, the "facts and circumstances can only provide context that elucidates the meaning of the words employed, and nothing else," and they can only give contract language a meaning to which it is "reasonably susceptible."[32] In other words, such evidence may not be "used to add, alter, or change the contract's agreed-to terms."[33]

This rule also applies to expert testimony and other evidence of industry custom and usage.[34] When we construe unambiguous contracts, we consider only objectively determinable extrinsic facts and circumstances surrounding the contract's execution[35] that do not vary or contradict the contract's plain language.[36] Although the 1986 deed is unambiguous, Engler asserts expert testimony is admissible to clarify and explain what the original drafting parties could have meant by "in the pipe line." We disagree because the testimony Engler relies on to construe that phrase would impermissibly add words of limitation to

[31] *Id.*

[32] *Id.* at 765.

[33] *Barrow-Shaver*, 590 S.W.3d at 485 (citing *URI*, 543 S.W.3d at 758; *Nat'l Union Fire Ins. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995)).

[34] *Id.* at 486-87 (holding evidence of industry custom to interpret an unambiguous contract inadmissible when such evidence would alter or contradict the contract's terms).

[35] *URI*, 543 S.W.3d at 768.

[36] *Barrow-Shaver*, 590 S.W.3d at 484.

modify the deed's terms.[37]  In addition, the expert's testimony says nothing about the industry meaning of "pipe line" in 1986 or about surrounding circumstances extant when the deed was executed.  Rather, the expert's affidavit merely discusses how "most" gas was "usually" processed and sold under "traditional" gas gathering agreements at that time.[38]  Because the proffered evidence does not elucidate the meaning of the 1986 deed's words, we do not consider it.

## B. Analysis

The 1986 deed requires delivery "free of cost in the pipe line, if any, otherwise free of cost at the mouth of the well or mine."  Though numerous types of pipelines are common in the oil-and-gas industry and some were in existence at the time the deed was executed, the instrument does not specify any particular pipeline or any particular *type* of pipeline, as it could have.  The deed also contemplates that there may not be any pipeline for delivery and, in that case, delivery defaults to an onsite locus—the mouth of the well or mine.

Here, there is no dispute that a gas pipeline exists and that Engler's royalty interest is to be delivered to its credit free of cost in that pipeline.  All agree that, in determining the value of Engler's share of production, BlueStone is not permitted to deduct postproduction costs

---

[37] *See id.* at 486 ("[W]hen a contract is unambiguous, we do not consider outside evidence, including industry custom and usage, to alter or contradict the terms.").

[38] *See* RESTATEMENT (SECOND) OF CONTRACTS § 220 cmt. d (AM. LAW INST. 1981); *id.* § 222(1) (trade custom or usage may vary the ordinary meaning of a word only when the usage has "such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement").

incurred prior to the delivery point. But whether a gathering system is a "pipe line" is hotly contested. In settling that matter, we apply well-established contract-construction principles in concluding that the onsite gathering system is, or at least includes, a pipeline into which delivery may be made under the 1986 deed. This is so because (1) a gathering pipeline is a pipeline in the ordinary, industry, and regulatory meaning of the term; (2) case law confirms that it is not uncommon for delivery of a royalty interest to be made into a "pipeline . . . to which the well is connected," rather than a downstream location; (3) the deed does not exclude such a pipeline from the usual meaning of the term or specify any particular type of pipeline; and (4) the inclusion of a default delivery location at or near the wellhead does not negate a wellsite delivery point but, instead, confirms it. Although the court of appeals' reading of *Burlington Resources* accords with our construction of the deed language, that case does not establish a rule that compels this conclusion.

### 1. *A Gathering System Is a Pipeline*

When an instrument does not indicate that language is being used in a technical or special way, we construe the instrument's words as "usually understood by persons in the business to which they relate."[39] To effectuate the drafting parties' intent, we consider the meaning of the terms at the time the 1986 deed was drafted.[40] Because the deed does not include a special definition of "pipe line," we look to

---

[39] *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 211 (Tex. 2011).

[40] *See id.* ("In construing an unambiguous oil and gas lease, . . . we seek to enforce the intention of the parties as it is expressed in the lease.").

ordinary and industry definitions to aid in our interpretation and analysis of this word.

We begin by consulting contemporaneous dictionaries and treatises,[41] both of which support the conclusion that the gathering system on the lease qualifies as a pipeline under the 1986 deed. The common understanding of a "pipeline" is "a line of pipe with pumps, valves, and control devices for conveying liquids, gases, or finely divided solids."[42] Williams & Meyers's dictionary of oil-and-gas terms similarly defines "pipeline" as: "A tube or system of tubes used for the transportation of oil or gas. Types of oil pipelines include: . . . *gathering lines*, extending from lease tanks to a central accumulation point[.]"[43] With respect to a gas gathering system, the definition of "pipeline" further says: "In the case of gas, the Gathering system . . . delivers the gas to the main pipeline which takes the gas directly to the distributor at the place of consumption."[44] The manual goes on to define the "gathering system" as a *network of pipelines* and other equipment that delivers gas to the *main* pipeline.[45] It also states:

---

[41] *See id.* (recognizing a contract did not include unique definitions of "drill" and "complete" and using the Williams & Meyers treatise, *Oil and Gas Law: Manual of Oil and Gas Terms*, to define the words).

[42] WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (9th ed. 1983).

[43] 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW 766 (Patrick H. Martin & Bruce M. Kramer, eds., 2021) (emphasis added). Engler acknowledges that the definitions provided in the 2020 edition of this treatise are "virtually the same" as those provided in the version existing when the deed was drafted. The definitions in the 2021 edition also remain the same, so we cite to the 2021 edition of the treatise for convenience.

[44] *Id.*

[45] *Id.* at 436.

17

A gathering system generally consists of "interconnected subterranean natural gas *pipelines* and related compression facilities that collect the raw gas from wells and deliver it to a central point, such as a processing plant."[46]

A sub-definition of a "gathering pipeline system" similarly describes it as "a system of interconnected subterranean *pipelines* and related compression facilities that collect the raw gas from wells and deliver it to a central point[.]"[47]  By ordinary or industry definition, the gathering system or gathering lines are composed of pipelines to which the minerals may be delivered.

Gathering systems are also treated as pipelines under various statutes and regulations.  For example, the Texas Administrative Code includes regulations for systems used to gather natural gas, describing such systems as "gathering pipelines" and "natural gas gathering pipelines."[48]  Similarly, many statutes use the word "pipeline" to describe oil-and-gas gathering systems.[49] Among others, the Health and

---

[46] *Id.* (emphasis added) (citing *Duke Energy Nat. Gas Corp. v. Comm'r*, 172 F.3d 1255, 1256 (10th Cir. 1999)).

[47] *Id.* at 436-36.1 (emphasis added).

[48] 16 TEX. ADMIN. CODE § 8.110; *see* 7 Tex. Reg. 3982, 3989 (1983), *subsequently amended* (former 16 TEX. ADMIN. CODE § 3.13) ("All gathering pipelines designed to transport oil, gas, condensate, or other oil or geothermal resource field fluids from a well or platform shall be equipped with automatically controlled shut-off valves at critical points in the pipeline system.").

[49] *See* TEX. NAT. RES. CODE § 111.084 (providing that a gathering system includes pipelines by stating a gathering system may be operated "by pipeline or by truck in connection with the purchase or purchase and sale of crude petroleum"); TEX. TAX CODE § 171.1012(k-2) (stating the statute applies to pipeline entities such as those "primarily engaged in gathering . . . crude oil,

18

Safety Code defines a "pipeline facility" as "a pipeline used to transmit or distribute natural gas or to gather or transmit oil, gas, or the products of oil or gas."[50] The Utilities Code likewise defines a low-pressure gathering system as "a pipeline that operates at a working pressure of less than 50 pounds per square inch."[51] While these statutory uses are certainly not conclusive, the regulatory treatment of gas gathering pipelines is informative and consistent with the meaning the word "pipeline" ordinarily carries.

Case law is concordant with this understanding, if not directly at least inferentially.[52] Often, deed or lease language requiring delivery "into the pipeline" is accompanied by language specifying the pipeline as the one "to which the lessee connects his wells."[53] Such limiting

---

including finished petroleum products, natural gas, condensate, and natural gas liquids").

[50] TEX. HEALTH & SAFETY CODE § 756.121(3).

[51] TEX. UTIL. CODE § 121.451(3).

[52] *See Bayou Pipeline Corp. v. R.R. Comm'n*, 568 S.W.2d 122, 124-26 (Tex. 1978) (referring to a gathering system as a "gas gathering pipeline" in discussing whether the system qualifies as a "utility" under a statute); *First Nat'l Bank of Seminole v. Hooper*, 104 S.W.3d 83, 84 (Tex. 2003) (describing the Owego Gathering System as a pipeline).

[53] *Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 207 (Tex. 2019) (collecting cases in analyzing the language of an assignment requiring delivery "into the pipeline, tank or other receptacle to which any well or wells on such lands may be connected"); *see, e.g., Cameron v. Stephenson*, 379 F.2d 953, 954 (10th Cir. 1967) ("[E]xecutors and assigns covenants to deliver free of cost to the credit of assignor at the pipeline to which he shall connect his wells . . . ."); *Kretni Dev. Co. v. Consol. Oil Corp.*, 74 F.2d 497, 497 (10th Cir. 1934) ("[F]ree of cost at the pipe lines, to which he may connect his wells . . . ."); *Molter v. Lewis*, 134 P.2d 404, 404-05 (Kan. 1943) ("To deliver to the credit of lessor, free of cost, in the pipe line to which he may

19

language is not present in the 1986 deed, but these cases demonstrate that it is not uncommon for a "pipeline" to be connected to the well or for delivery to occur at that point on the wellsite premises. The absence of such limiting language in the 1986 deed makes it broader, not narrower, than the provisions construed in other cases, confirming rather than repudiating that a gathering system is, or at least includes, a pipeline for delivery.

The North Dakota Supreme Court recently interpreted a similar in-kind royalty provision in *Blasi v. Bruin E&P Partners, LLC*.[54] The *Blasi* royalty clause provided that the lessee agreed to deliver to the lessor's credit, "free of cost, in the pipeline to which Lessee may connect wells on said land, the equal [fractional] part of all oil produced and saved from the leased premises."[55] While this royalty provision included "connected at the well" language, Blasi, the royalty holder, argued that the delivery point was "the pipeline" and that "the term 'pipeline' [did]

---

connect his wells . . . ."); *Voshell v. Indian Territory Illuminating Oil Co.*, 19 P.2d 456, 457 (Kan. 1933) ("To deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells . . . ."); *Hamilton v. Empire Gas & Fuel Co.*, 230 P. 91, 91 (Kan. 1924) ("To deliver to the credit of the first party, his heirs or assigns, free of cost, in the pipe line to which it may connect its wells . . . ."); *Scott v. Steinberger*, 213 P. 646, 647 (Kan. 1923) (analyzing a lease stating the royalty should be paid "free of cost in the pipe lines to which he may connect his wells"); *Rains v. Ky. Oil Co.*, 255 S.W. 121, 122 (Ky. 1923) ("[S]econd party agrees to deliver to the first party . . . in the pipe line with which it may connect the well or wells . . . ."); *Wall v. United Gas Pub. Serv. Co.*, 152 So. 561, 562 (La. 1934) ("[L]essees shall deliver to the credit of the lessors, free of cost, in the pipe line to which he may connect his wells . . . .").

[54] 959 N.W.2d 872, 877 (N.D. 2021).

[55] *Id.* at 876.

not refer simply to any pipe or tube connected to the well itself."[56] Similar to the argument Engler makes here, Blasi maintained that "pipeline," as contemplated by the lease, meant "a pipe used to transport oil to a refinery—the type that is 'generally regulated by state or federal authorities for moving oil hundreds or thousands of miles, not a pipe between the wellhead and the tank battery to move oil a few feet.'"[57]

In assessing Blasi's argument, the court pointed out that "[t]he royalty provision itself identifie[d] the pipeline that [was] contemplated"—a pipeline connected to the well—so analyzing industry definitions of pipeline was unnecessary.[58] Further, the court concluded that the provision, by its language, did "not designate a specific type of pipe as 'the pipeline.'"[59] Blasi's interpretation, the court said, would introduce "considerable uncertainty," and parties should not have to examine physical characteristics of various pipes to determine if it is "the pipeline."[60] Additionally, barring evidence that the parties envisioned different delivery points for different minerals, the court found it irrational to construe the delivery point in such a way that it changes depending on the means by which a mineral is transported.[61] For example, a royalty calculation for oil that is delivered by truck directly to a consumer and that never enters a commercial pipeline of

---

[56] *Id.* at 877.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

the sort that Blasi envisioned should not be different from a calculation for a mineral transported via such a pipeline.[62]  Finally, the court pointed out that the provision did not require the existence of a pipeline; rather, the word "may" in the clause provided a failsafe that prevented a lessee from avoiding a royalty obligation by failing to connect a pipeline to the well.[63]  The delivery point, therefore, was the point that remained constant regardless of the type of minerals produced and regardless of whether a pipeline existed at the wells.[64]

Despite the use of different language, the royalty provision at issue here is analogous, and the effect of the deed's language is the same. An onsite gathering pipeline qualifies as a pipeline, and the 1986 deed's reference to a failsafe or default delivery point at or near the point of production does not exclude such a pipeline from bearing its common meaning.  To the contrary, the alternative phrasing ensures parity in the delivery obligation regardless of the type of mineral produced and the availability of a pipeline for delivery of such minerals.

2. *The Deed Language Does Not Prohibit Delivery At or Near the Well*

As previously noted, the 1986 deed does not identify any particular pipeline, specify a particular downstream delivery point, or otherwise refer to a pipeline located off the wellsite premises.  To construe the deed as referring to a particular pipeline or a pipeline located off the premises would require adding words of limitation to the

---

[62] *See id.*

[63] *See id.*

[64] *See id.* at 877-78.

deed, but we cannot rewrite or add to the instrument under the guise of interpretation.[65]

Engler nonetheless contends that the deed language implicitly, if not expressly, negates a construction of "pipe line" as being any pipeline in close proximity to the well. If that were the case, the deed would necessarily limit the delivery point to some downstream pipeline location—either at the transportation pipeline (as the trial court held) or the distribution pipeline (a construction of the deed Engler has abandoned). In advancing this construction of the deed, Engler focuses on the word "otherwise," asserting the deed contemplates a dichotomy between two potential delivery points—offsite and onsite. In Engler's view, the word "otherwise" *precludes* delivery near the mouth of the well if any pipeline exists, thus foreclosing the possibility that "pipe line" could refer to the gas gathering system given its proximity to the mouth of the well. Engler posits that the deed's preferred and default delivery locations cannot be the same or similar, so the phrase "the pipe line, if any" must refer to the off-premises transportation pipeline.

To achieve its desired construction of the deed, Engler contorts the definition of "otherwise," which generally means: "in a different way or manner"; "in different circumstances"; "in other respects"; "if not;"[66] "in another way, or in other ways."[67] These definitions do not support

---

[65] *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 481, 487 (Tex. 2019).

[66] WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (9th ed. 1983).

[67] BLACK'S LAW DICTIONARY (5th ed. 1979).

the dichotomy Engler asserts or foreclose the possibility that the two delivery points may ultimately yield the same valuation.

Engler's royalty is for a fractional share of "oil, gas or other minerals" produced from the land and, in describing the royalty interest, the deed does not distinguish among the types of minerals that may be produced. That being the case, the word "otherwise", when considered in connection with the immediately preceding "if any" phrase, simply creates a preferential delivery point if any pipeline exists for the specific mineral being produced and a default delivery point at the mouth of the well or mine if there is no such pipeline or when the produced mineral is not capable of delivery into a pipeline.[68] Harmonizing the entirety of the royalty clause in this way creates internal consistency and parity among the specified delivery points—"the pipe line" and "the mouth of the well or mine"—and among the various types of minerals that may be produced. Engler's favored construction does not.

---

[68] To illustrate: some minerals, like gas, *must* be delivered into a pipeline; minerals like oil *may or may not* be delivered into a pipeline; and other minerals, like coal, *would not* be delivered into a pipeline. *See Blasi*, 959 N.W.2d at 877-78 (analyzing how oil may be transported by various means and may never reach a commercial pipeline); 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW 436 (Patrick H. Martin & Bruce M. Kramer, eds., 2021) (explaining that gas collected via a gathering line continually flows from the well to the ultimate consumer, since gas cannot be stored). If "pipe line" could potentially mean an off-premises transportation pipeline, this would create a disparity in the delivery points for different minerals—oil transported by truck from the well would be valued "at the mouth of the well," whereas gas transported via pipeline would be valued downstream at the transportation pipeline. Under Engler's construction of the deed, the variety of potential delivery points could yield vastly different royalty calculations for no discernable or textually supportable reason.

Further, given the existence of transportation pipelines at the time the deed was executed, the failure to mention such pipelines—by description or even by type—is telling. This circumstance coupled with the *nonexistence* of a gathering pipeline at that time as well as the articulation of a wellsite delivery point as *a default*, supports the parties' intent that delivery would occur into pipelines *on the wellsite*, *if any*, rather than an intent to establish a downstream delivery point that would result in a markedly different royalty calculation.

### 3. *Contracts Are Construed According to Their Terms*

Although mineral transactions are subject to certain presumptions that state the "usual" rules, we have repeatedly affirmed that parties are free to make their own bargains, and courts are obligated to enforce agreements as the parties intended.[69] We discern that intent from the language the parties used to express their accord, viewed not in isolation, but in context.[70] The analysis in *Burlington Resources* expresses, applies, and confirms this principle.[71] There, we held that language assigning an overriding royalty interest equated certain language specifying an "into the pipeline" delivery point with an "at the mouth of the well" valuation.[72] But we did not fashion a rule to that effect. To the contrary, we explained that "the decisive factor in

---

[69] *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121-22 (Tex. 1996) (emphasizing oil-and-gas royalty agreements are construed under general rules that may be modified by the parties' agreement).

[70] *Id.* at 121.

[71] *See Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 202-11 (Tex. 2019).

[72] *Id.* at 211.

each [contract-construction] case is the language chosen by the parties to express their agreement."[73]  Just as in *Burlington Resources*, our analysis here turns not on an immutable construct but on the parties' chosen language.

### III. Conclusion

Under the 1986 deed, BlueStone satisfies its obligation to deliver Engler's share of production "free of cost in the pipe line" by accounting for Engler's fractional share on a net-proceeds basis that deducts from gross sales proceeds the postproduction costs incurred after delivery in the gas gathering system on the wellsite premises.  We therefore affirm the court of appeals' judgment for BlueStone.

John P. Devine
Justice

**OPINION DELIVERED:** February 4, 2022

---

[73] *Id.* at 200.